UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PLUMBERS' UNION LOCAL NO. 12 PENSION FUND, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 08-cv-10446 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | CONSOLIDATED AMENDED |
| vs. | ) ) | COMPLAINT FOR VIOLATION OF §§11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933 |
| NOMURA ASSET ACCEPTANCE CORPORATION, et al., | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |
| | ) | |

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates (the "Certificates") of Nomura Asset Acceptance Corporation ("Nomura Asset" or the "Company") pursuant and/or traceable to false and misleading Registration Statements dated July 22, 2005 and April 19, 2006, and Prospectus Supplements issued in connection with the Certificates and which were incorporated by reference therein between September 27, 2005 and December 1, 2006 (collectively, the "Registration Statements"). This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.     Nomura Asset was formed in 1992 for the purpose of acquiring, owning and transferring mortgage loan assets and selling interests in them. Nomura Asset is a subsidiary of Nomura Asset Capital Corporation ("Nomura Capital"), also known as the Capital Company of America, a real estate finance subsidiary of Nomura Holding America Inc. Nomura Asset is engaged in mortgage loan lending and other real estate finance-related businesses, including mortgage loan banking, mortgage warehouse lending, and insurance underwriting. The issuers of the various offerings (the "Defendant Issuers") are Nomura Asset and the Trusts identified in ¶15, which were established by Nomura Asset to issue billions of dollars worth of Certificates in 2005 and 2006.

3.     On July 22, 2005 and April 19, 2006, the Defendant Issuers caused Registration Statements to be filed with the Securities and Exchange Commission ("SEC") in connection with, and for the purpose of, issuing hundreds of millions of dollars of Certificates. The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statements. The Certificates were supported by pools of mortgage loans. The Registration Statements represented that the mortgage pools would primarily consist of loans generally secured

by first and second liens on residential properties, including conventional, adjustable rate and negative amortization mortgage loans.

4.     Investors who purchased the Certificates were concerned with: (a) the interest rate or Certificate yield; (b) the timing of principal and interest payments; and (c) the safety of the investment (risk of default of the underlying mortgage loan assets), including the ratings of the Certificates.   The representations in the Registration Statements concerning the mortgages underlying the Certificates, and the attendant risks, were therefore material to investors. Unfortunately for investors, many of these representations were materially false and misleading.

5.     As detailed herein, the Registration Statements included false statements and/or omissions about: (i) the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; (iv) the debt-to-income ratios permitted on the loans; (v) the delinquency of mortgage loans prior to being purchased and transferred to the Trusts; and (vi) the true ratings of the Certificates.

6.     The true, but undisclosed facts, were:

(a)     that the sellers of the underlying mortgage loans to Nomura Asset were issuing many of the mortgage loans to borrowers who: (i) did not meet the prudent or maximum debt-to-income ratio purportedly required by the lender; (ii) did not provide adequate documentation to support the income and assets required to issue the loans pursuant to the lenders' own guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income or

assets required by the lenders' own guidelines to afford the required mortgage loan payments, which resulted in a mismatch between the needs and capacity of the borrowers;

(b)     that the lenders or the lenders' agents knew that the borrowers either could not provide the required documentation or the borrowers refused to provide it and therefore issued numerous loans that would be the equivalent of sub-prime loans which were disguised as Alt-A loans;

(c)     that the Certificates were not "Investment Grade" but rather were far riskier than represented;

(d)     that dozens of borrowers were 30 or more days delinquent on mortgage loans at the "cut off date" upon which they were transferred to the Trusts;

(e)     that, in fact, the underwriting, quality control, and due diligence practices and policies utilized in connection with the approval and funding of the mortgage loans were so weak or non-existent that borrowers were being extended loans based on stated income in the mortgage loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan applications or through a check of free "online" salary databases such as salary.com; and

(f)     that the appraisals of many properties were inflated, as appraisers were induced by lenders, lenders' correspondents and/or their mortgage brokers/agents, to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved and funded.  In this way, many appraisers were rewarded for their willingness to

support preconceived or predetermined property values violating USPAP regulations[1] and making the stated loan-to-value ("LTV") ratios false.

7.    As a result of the foregoing, the Certificates sold to Plaintiffs and the Class were secured by assets that had a greater risk profile than what was represented in the Registration Statements.  Moreover, given the great disparity between the actual performance of the assets and the expected performance of the assets, any reasonable assumptions or projections of future performance were impossible.

8.    By the summer of 2007, the truth about the performance of the mortgage loans that secured the Certificates began to be revealed to the public and the rating agencies began to put negative watch labels on Certificate tranches or classes, ultimately downgrading many.  As a result, the Certificates future cash flow was negatively impacted.  As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by Plaintiffs and the Class and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statements/Prospectus Supplements represented.

## JURISDICTION AND VENUE

9.    The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

---

[1]    The Uniform Standards of Professional Appraisal Practice ("USPAP") are the generally accepted standards for professional appraisal practice in North America.  USPAP contains standards for all types of appraisal services.  Standards are included for real estate, personal property, business and mass appraisal.

10.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Nomura Asset and each of the bank defendants conduct business in this District.

**PARTIES**

11.     Plaintiff Plumbers' Union Local No. 12 Pension Fund acquired $115,000 worth of Certificates from defendant Nomura Securities International, Inc. ("Nomura Securities") pursuant and traceable to the April 19, 2006 Registration Statement and the Prospectus Supplement for Trust No. 2006-AF1 and has been damaged thereby.

12.     Plaintiff Plumbers & Pipefitters' Welfare Educational Fund acquired $115,000 worth of Certificates from defendant Nomura Securities pursuant and traceable to the July 22, 2005 Registration Statement and the Prospectus Supplement for Trust No. 2006-AP1 and has been damaged thereby.

13.     Plaintiff NECA-IBEW Health & Welfare Fund acquired $55,000 worth of Certificates from defendant Nomura Securities pursuant and traceable to the July 22, 2005 Registration Statement and the Prospectus Supplement for Trust No. 2006-AP1 and acquired $55,000 worth of Certificates from defendant Nomura Securities pursuant and traceable to the April 19, 2006 Registration Statement and the Prospectus Supplement for Trust No. 2006-AF1 and has been damaged thereby.

14.     Defendant Nomura Asset is a Delaware corporation headquartered in New York, New York. It is a special purpose corporation formed in 1992. Nomura Asset served in the role of the "Depositor" in the securitization of the Issuing Trusts as identified below, and was an "Issuer" of the Certificates within the meaning of the 1933 Act, 15 U.S.C. §77b(a)(4).

15.     Nomura Asset and the Issuing Trusts (together the "Defendant Issuers") issued the various Certificates in each of the Delaware trusts. The Defendant Issuers issued hundreds of

millions of dollars worth of Certificates in each of these Trusts pursuant to one of the Prospectus

Supplements which listed numerous classes of the Certificates.  The Trusts are:

| | |
|---|---|
| Alternative Loan Trust 2006-AF1 | Alternative Loan Trust 2006-AF2 |
| Alternative Loan Trust 2006-AP1 | Alternative Loan Trust 2006-AR1 |
| Alternative Loan Trust 2006-AR2 | Alternative Loan Trust 2006-AR3 |
| Alternative Loan Trust 2006-AR4 | Alternative Loan Trust 2006-WF1 |

16.     Defendant Nomura Securities is a securities firm which provides a range of financial

services, including engaging in the mortgage banking business.  Nomura Securities is a corporation

based in New York, New York.  Nomura Securities acted as the underwriter in the sale of Nomura

Asset offerings, helping to draft and disseminate the offering documents.  Nomura Securities was the

underwriter of the following Trusts:

| | |
|---|---|
| 2006-AF1 | 2006-AF2 |
| 2006-AP1 | 2006-AR1 |
| 2006-AR2 | 2006-AR3 |
| 2006-WF1 | |

17.     Defendant UBS Securities LLC ("UBS") is a global investment banking and

securities firm which provides a range of financial services, including advisory services,

underwriting, financing, market making, asset management, brokerage and retail banking on a global

level.  UBS acted as the underwriter in the sale of Nomura Asset offerings, helping to draft and

disseminate the offering documents.  UBS was the underwriter of the following Trust:

2006-AR4

18.     Defendant Greenwich Capital Markets, Inc. ("GCM") is an institutional fixed-income

firm providing a full range of debt capital market services to both those seeking to raise capital and

those seeking to invest it.  RBS Greenwich Capital is the marketing name for the securities business

of GCM.  GCM is a wholly-owned subsidiary of the Royal Bank of Scotland Group PLC.  GCM

acted as the underwriter in the sale of Nomura Asset offerings, helping to draft and disseminate the

offering documents.  GCM was the underwriter of the following Trusts:

2006-AF2             2006-AR4

19.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a subsidiary of Citigroup Inc., a large integrated financial services institution that, through subsidiaries and divisions, provides commercial and investment banking services, commercial loans to corporate entities, and acts as the underwriter in the sale of corporate securities.  Citigroup acted as the underwriter in the sale of Nomura Asset offerings, helping to draft and disseminate the offering documents.  Citigroup was the underwriter of the following Trust:

2006-WF1

20.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a wealth management, capital markets and advisory company which offers a broad range of services to private clients, small businesses, institutions and corporations.  As an investment bank, it is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide. Merrill Lynch acted as the underwriter in the sale of Nomura Asset offerings, helping to draft the offering documents.  Merrill Lynch was the underwriter of the following Trust:

2006-AF2

21.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a global investment banking, securities and investment management firm that provides a wide range of services worldwide to a substantial and diversified client base that includes corporations, financial institutions, governments and high net-worth individuals.  Goldman Sachs acted as the underwriter in the sale of Nomura Asset offerings, helping to draft and disseminate the offering documents.  Goldman Sachs was the underwriter of the following Trust:

2006-AR3

22.     Defendant John P. Graham ("Graham") was Chief Executive Officer ("CEO") and President of Nomura Asset during the relevant time period.  Defendant Graham signed the July 22, 2005 and April 19, 2006 Registration Statements.

23.     Defendant Nathan Gorin ("Gorin") was Controller and Chief Financial Officer of Nomura Asset during the relevant time period.  Defendant Gorin signed the July 22, 2005 and April 19, 2006 Registration Statements.

24.     Defendant John McCarthy ("McCarthy") was a director of Nomura Asset during the relevant time period.  Defendant McCarthy signed the July 22, 2005 and April 19, 2006 Registration Statements.

25.     Defendant Shunichi Ito ("Ito") was a director of Nomura Asset during the relevant time period.  Defendant Ito signed the July 22, 2005 and April 19, 2006 Registration Statements.

26.     Defendant David Findlay ("Findlay") was a director of Nomura Asset during the relevant time period.  Defendant Findlay signed the July 22, 2005 and April 19, 2006 Registration Statements.

27.     The defendants identified in ¶¶22-26 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Trusts as they were directors to Nomura Asset and signed the Registration Statements for the registration of the securities issued.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Certificates pursuant and/or traceable to the false and misleading Registration Statements (Registration Nos. 333-126812 and 333-132108) dated July 22, 2005 and April 19, 2006, and/or the Prospectus Supplements issued in connection with the Certificates between September 27, 2005 and December 1, 2006 which were incorporated therein, and who were damaged thereby (the "Class").

Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nomura Asset and Nomura Securities or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Registration Statements were used to issue hundreds of millions of dollars worth of Certificates.

30.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether Defendants violated the 1933 Act;

        (b)     whether the Registration Statements issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and

- 9 -

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Nomura and Its Businesses**

34.    Nomura Holdings, Inc. ("Nomura Holdings"), together with its subsidiaries, provides investment, financing, and related services to corporations, financial institutions, individuals, and governments and governmental agencies worldwide.  It operates through five segments: Domestic Retail, Global Markets, Global Investment Banking, Global Merchant Banking, and Asset Management.  Nomura Holdings is a holding company for the Nomura Group.  The Nomura Group, one of the largest global investment banking and securities firms, is represented in North and South America by Nomura Holding America Inc. ("NHA").  Nomura Credit & Capital, Inc. ("Nomura Credit"), a subsidiary of NHA, is the primary entity involved in the origination, purchase and sale of mortgage loans.  Nomura Securities, a subsidiary of NHA, acts as NHA's broker/dealer.

35.    Nomura Capital is a subsidiary of Nomura Holdings.  Nomura Capital formed Nomura Asset, a special purpose Delaware corporation, to engage in mortgage lending and other real estate finance-related businesses, including mortgage loan banking, mortgage loan warehouse lending, and insurance underwriting.  Nomura Asset was created to acquire mortgage loan pools that were transferred to the Trusts, and Certificates of various classes were sold to investors pursuant to Registration Statements and Prospectus Supplements.

**Residential Mortgage Loan Categories**

36.     Borrowers who require funds to finance the purchase of a house, or to refinance an existing mortgage, apply for residential mortgage loans with a loan originator. These loan originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score. Generally, borrowers with higher FICO scores were able to receive loans with less documentation during the approval process, as well as higher loan-to-values. Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the interest rate of the loan to issue, the amount of the loan (loan-to-value), and the general structure of the loan.

37.     A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health. Borrowers who are issued "prime" mortgage loans are deemed to be the most credit-worthy and receive the best rates and structure on mortgage loans.

38.     If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his financial health, then a loan originator will issue the borrower a loan referred to as a low documentation or Alt-A loan, and the interest rate on that loan will be higher than that of a prime mortgage loan and the general structure of the loan will not be as favorable as it would be for a prime borrower. While borrowers of low documentation or Alt-A loans typically have clean credit histories, the risk profile of the low documentation or Alt-A loan

increases because of, among other things, higher LTV ratios[2], higher debt-to-income ratios or inadequate documentation of the borrower's income and assets/reserves.

39.    A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt ratios.  Borrowers that have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger than average risk of defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate themselves for assuming more risk.

**The Secondary Market**

40.    Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan.  The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation.  Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan.  As such, under the traditional model, the loan originator had a financial incentive to ensure that: (1) the borrower had the financial wherewithal and ability to repay the promissory note; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

---

[2]    A loan-to-value ratio is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of mortgage-backed securities.  The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property.  For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%.

41.     Beginning in the late 1990s, persistent low interest rates and low inflation led to increased demand for mortgages.  As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market.  As discussed below, these innovations altered the foregoing traditional lending model, severing the traditional direct link between borrower and lender, and the risks normally associated with mortgage loans.

42.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages.  Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution.  By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages.  The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as mortgage-backed securities or MBS.  In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

43.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools.



(Source: *The Wall Street Journal*)

44.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  Of course, since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

45.     In this MBS structure, the senior tranches received the highest investment rating by the rating agencies, usually AAA.  After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds.  In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the rating agencies.

46.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage-borrowers are current on their mortgages.  The following diagram illustrates the concept of tranches within a MBS comprised of residential mortgages (often referred to as a "residential mortgage backed securities" or "RMBS"):



(Source: *The Wall Street Journal*)

47.    As illustrated below, in the typical securitization transaction, participants in the transaction are: (1) the servicer of the loans to be securitized, often called the "sponsor"; (2) the depositor of the loans in a trust or entity for securitization; (3) the underwriter of the MBS; (4) the trust; and (5) the investors in the MBS.

48.    Viewing the securitization process as a series of arms-length transactions, the process of securitization begins with the sale of mortgage loans by the sponsor—the original owner of the mortgages – to the depositor in return for cash.  The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor.  The depositor then works with the underwriter of the trust to price and sell the certificates to investors.



49.    Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors. After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

50.    In this case, however, the transactions among the sponsor, depositor and trusts were not arms-length transactions as all these entities were interrelated. The sponsor was Nomura Credit. Nomura Credit held all the shares of capital stock of the depositor, Nomura Asset. The Trusts were set up by Nomura to acquire mortgage loans. Further, the underwriter for the majority of the trusts was Nomura Securities – an "affiliate" of Nomura Credit.

**Sub-Prime and Low Documentation Alt-A Loans and the Secondary Market**

51.    Over the past 30 years, the sub-prime mortgage market has evolved from being just a small percentage of the overall U.S. home mortgage market to one that has originated hundreds of billions of dollars of sub-prime loans annually. While several important legislative and regulatory changes have induced such growth, the sub-prime mortgage market would not have experienced such enormous growth without the development of a strong secondary market for home mortgage loans.

52.    During the 1980s, credit rating agencies began rating privately-issued MBS, which made them more suitable to a wider range of investors and expanded the market for MBS. By 1988, 52% of outstanding residential mortgage loans had been securitized, up from 23% four years earlier.

53.    This rapid expansion of the secondary mortgage market significantly increased mortgage lenders' access to capital and dramatically reduced the need for loan originators to possess a large deposit base in order to maintain their liquidity. As a result, non-depository mortgage lenders proliferated, comprising approximately 32% of lenders of home mortgage loans by 1989.

54.     During the early to mid-1990s, rising interest rates decreased the demand for prime mortgage loans.  To spur continued sales of mortgages, lenders became amenable to originating sub-prime mortgages.  This willingness, coupled with technological advances that helped credit rating companies accumulate credit information on a greater number of debtors, increased the market for sub-prime mortgage loans.  By 1998, approximately $150 billion in sub-prime mortgage loans were originated, up from approximately $35 billion in 1994.

55.     The growth in the sub-prime mortgage loan market during the 1990s was also aided by mechanisms that purported to allocate and/or moderate risk in sub-prime MBS.  These mechanisms, called "credit enhancements," allowed issuers to obtain investment-grade ratings on all, or part of, their MBS, despite the higher risk on the sub-prime mortgages upon which the MBS were based.

56.     As a result of these credit enhancement mechanisms, MBS were deemed to be suitable to a wider market of investors, and the value of sub-prime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997.  These sales of MBS provided lenders, including non-depository and mortgage-only companies who were responsible for much of the sub-prime mortgage lending, with ample liquidity to originate new sub-prime loans.  By 2005, the amount of new sub-prime mortgage loans that were originated grew to over $620 billion.

57.     During the 1990s, a new category of mortgage loans emerged.  These loans, which became very popular between 2004 through 2006, offered more lenient lending standards than "prime" loans, but were considered less risky than "sub-prime" loans.  This loan category, which consisted primarily of Alt-A loans, was originally designed for self-employed borrowers who had high FICO scores and were able to document assets, but could not easily document their income.

The Alt-A loans enabled these borrowers to be approved for a mortgage without extensive supporting documentation of their financial history or income.

58.    While Alt-A loans generally have hard to define characteristics, their most distinctive attribute is that borrowers are not required to provide supporting documentation with their applications. For example, a borrower typically does not provide complete documentation of his assets or the amount or source of his income. Other characteristics of Alt-A loans include: (i) LTV ratio in excess of 80%, but that lack primary mortgage insurance; (ii) a borrower who is a temporary resident alien; (iii) the loan is secured by non-owner occupied property; or (iv) a debt-to-income ratio above normal limits. MBS that are backed by Alt-A loans are appealing because Alt-A loans are perceived to offer temporary protection from prepayment risk, which is the risk that borrowers will pay off their loans immediately. Mortgage loan securitizations were traditionally valued using prepayment speeds as an important component. Alt-A loan borrowers show greater resistance to prepayments during the first nine to twelve months following their origination. Prime borrowers, by contrast, tend to be very sensitive to changing interest rates and they refinance or prepay their mortgage loans on a continual basis as interest rates decline.

59.    The introduction of Alt-A loans eventually gave way to abuses wherein borrowers or mortgage brokers used the Alt-A process to inflate earnings on loan applications. The market for Alt-A loans, or so called "liar loans," has increased faster than that of sub-prime. A record $400 billion of Alt-A loans were originated in 2006 and accounted for 13.4% of all mortgages offered that year, up from 2.1% in 2003. However, the delinquency rate for Alt-A loans has also increased. After 18 months, Alt-A loans that were originated in 2006 had a delinquency rate of 4.71%, versus 1.97% for such loans from 2005 and 1.07% for 2004. The trend for 2007 loans is even worse than 2006.

60.    Additionally, over the past several years, the quality of the borrowers of Alt-A-type mortgage loans has weakened. During this time, Alt-A-type loans were extended to borrowers who should otherwise have qualified for: (i) sub-prime loans; (ii) much smaller dollar value loans at lower LTV ratios; or (iii) no mortgage loans at all.  These lower quality Alt-A-type loans were either Alt-B loans, sub-prime loans, or loans for completely unqualified borrowers, and include increased risk such as a high LTV ratio and the lack of supporting financial documentation.  Essentially, these Alt-B loans are sub-prime loans in disguise and should not have been securitized without sufficient disclosures as to the true quality of the loans.  However, certain of these Alt-B mortgage loans were securitized and improperly presented as being the higher-quality Alt-A loans.

**Nomura Acquires Loans and Sells Certificates Backed by These Loans to Plaintiffs and the Members of the Class**

61.    Nomura Credit purchased mortgage loans that were classified as mainly Alt-A and Alt-B loans, from several originators.  Nomura Asset then acquired these mortgage loans from Nomura Credit pursuant to mortgage loan purchasing agreements.  Nomura Asset purchased and subsequently transferred the mortgage loans to the defendant issuers, as set forth in the pooling and servicing agreements and other documents.  These loans were then pooled, secured certificates were issued and the Certificates were sold to investors pursuant to the Registration Statements and Prospectus Supplements.

62.    Nomura Asset caused the following Registration Statements to be issued between July 2005 and November 2006, which were used to issue hundreds of millions of dollars in Certificates:

| REGISTRATION STATEMENT DATE | REGISTRATION NO. | TRUST NO. |
|---|---|---|
| April 19, 2006 | 333-132108 | 2006-AF1 |
|  |  | 2006-AF2 |
|  |  | 2006-WF1 |
|  |  | 2006-AR3 |

|              |             | 2006-AR4                         |
| July 22, 2005 | 333-126812  | 2006-AR1<br>2006-AP1<br>2006-AR2 |

63.    The Trusts and Nomura Asset were the "Issuers" which caused the Registration Statements, dated July 22, 2005 and April 19, 2006, to be filed with the SEC.  The Registration Statements and prospectus supplements which were incorporated into the Registration Statements provided additional information regarding the mortgage loans contained in the mortgage pools held by the Defendant Issuers.  In the Registration Statements, Defendants represented that the loans underlying the Certificates were loans made to creditworthy borrowers.

64.    Nomura Asset also caused Prospectus Supplements to be issued between September 2005 and December 2006.  The Prospectus Supplements issued by Nomura included:

| | |
|---|---|
| May 25, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AF1 | March 29, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AR2 |
| July 28, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AF2 | September 28, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AR3 |
| September 27, 2005 Prospectus Supplement for Alternative Loan Trust, Series 2006-AP1 | November 30, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AR4 |
| February 15, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AR1 | August 29, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-WF1 |

65.    The Trusts and Nomura Asset, as Issuers, caused the Prospectus Supplements to be filed with the SEC.  The Prospectus Supplements that were issued for each Trust explained the characteristics of the mortgages that Nomura Asset had acquired and transferred to each Trust and the related Certificates that were issued pursuant to the respective Prospectus Supplement.

66.    The Prospectus Supplements described the details of the Certificates issued from each Trust, including the Certificates' ratings, the interest rates and the principal balances.  The Prospectus Supplements also provided information regarding the mortgage loans transferred to the

Trusts and identified the major originators of the mortgage loans for each pool and the underwriting standards that were allegedly used in originating the mortgage loans.

**The Registration Statements and Prospectus Supplements Which Were Incorporated into the Registration Statements Misrepresented and Omitted Material Information Regarding the Poor Loan Underwriting Used to Generate the Underlying Mortgage Loans**

67.     The Registration Statements and the Prospectus Supplements which were incorporated into the Registration Statements contained representations concerning the standards purportedly used to underwrite the mortgages in the Issuing Trusts.  Sound underwriting is critically important to the investors acquiring the Certificates issued by the Issuing Trusts because the ability of borrowers to repay the principal and interest on the mortgages collateralizing the Issuing Trusts is the fundamental basis upon which the investment in the Certificate is valued.  If however, the mortgages pooled in the MBS suffered delinquencies in excess of the assumptions built into the mortgage pool, owners of the Certificates would suffer losses as the principal and income necessary to service the Certificates would necessarily diminish.  This would reduce the yield on the Certificates and their corresponding value.

68.     The Prospectus Supplements each contained specific representations about the underwriting guidelines used by the loan originators to issue the mortgages which ultimately backed the securities at issue.  These statements indicated that the originators would evaluate the prospective borrower's credit standing and the ability to repay the loan, and would evaluate the value and adequacy of the proposed mortgaged property as collateral.

69.     The Prospectus Supplement for Alternative Loan Trust, Series 2006-AF1, Series 2006-AP1, and Series 2006-AR4 stated that key originator First National Bank of Nevada's ("FNBN") "underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan" and "are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations."  These Prospectus

Supplements further falsely and misleadingly stated that a "prospective borrower must have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion" and that "employment history is verified through written or telephonic communications." These Prospectus Supplements stated:

> *FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral*. A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. *FNBN employs or contracts with underwriters to scrutinize the prospective borrower's credit profile*. If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements. . . .

> Based on the data provided in the application and certain verifications (if required), a determination will have been made that the borrower's monthly income (if required to be stated or verified) should be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the mortgaged property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses). Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income. The percentage applied varies on a case by case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.

> *       *       *

> *FNBN's underwriting guidelines are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations*. However, the application of FNBN's underwriting guidelines does not imply that each specific criterion was satisfied individually. FNBN will have considered a mortgage loan to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, in FNBN's discretion such mortgage loan is in substantial compliance with such underwriting guidelines or if the borrower can document *compensating factors*. A mortgage loan may be considered to comply with a set of underwriting guidelines, even if one or more specific criteria included in such underwriting guidelines were not satisfied, if other

- 22 -

factors compensated for the criteria that were not satisfied or the mortgage loan is considered to be in substantial compliance with the underwriting guidelines.

70.     The Prospectus Supplement for Alternative Loan Trust, Series 2006-AF1 and Series 2006-AF2 stated that one of its key originators, Metrocities Mortgage, LLC's ("Metrocities"), "Underwriting Guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral" and "are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations." These Prospectus Supplements stated:

> *The Underwriting Guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. The Underwriting Guidelines are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations*. On a case-by-case basis, the [sic] Metrocities may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under the Underwriting Guidelines, warrants an exception. Compensating factors may include, but are not limited to, loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address.

*     *     *

> Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income. The percentage applied varies on a case by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

71.     The Prospectus Supplement for Alternative Loan Trust, Series 2006-AR3 and Series 2006-AR4 stated that its originators, including Silver State Mortgage ("Silver State"), follow certain underwriting standards and represented that: "Generally, each borrower will have been required to

complete an application designed to provide to the original lender pertinent credit information concerning the borrower." These Prospectus Supplements further stated:

> Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

72.     The Prospectus Supplement for Alternative Loan Trust, Series 2006-WF1 stated its sole originator, Wells Fargo Bank, N.A.'s ("Wells Fargo") "underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." The Prospectus Supplement further stated:

> A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant, with particular emphasis on the applicant's financial health (assets, liabilities, income and expenses), the property being financed and the type of loan desired. . . . Generally, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant.

> *     *     *

> Verifications of employment, income, assets or mortgages may be used to supplement the loan application and the credit report in reaching a determination as to the applicant's ability to meet his or her monthly obligations on the proposed mortgage loan, as well as his or her other mortgage payments (if any), living expenses and financial obligations.

73.     This Prospectus Supplement provided that in the case of stated income loans:

> The borrower's employment, income sources and assets must be stated on the signed loan application. The borrower's income as stated must be reasonable for the

borrower's occupation as determined in the discretion of the loan underwriter. Similarly, the borrower's assets as stated must be reasonable for the borrower's occupation as determined in the discretion of the loan underwriter.

74.    The remaining Prospectus Supplements (Alternative Loan Trust, Series 2006-AR1 and Series 2006-AR2) each contained the following representations about their originators' underwriting standards:

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. . . .

Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan. The originator may also consider the amount of liquid assets available to the borrower after origination.

75.    The April 19, 2006 Registration Statement contained representations similar to those found in the Prospectus Supplements which were incorporated into it.  The Registration Statement represented:

Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information . . . .

Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  Generally, scheduled payments on a

- 25 -

mortgage loan during the first year of its term . . . equal no more than . . . 60% of the prospective borrower's gross income.

76.     ***Omitted Information***:  The originators of the mortgages transferred to the trusts were not reviewing loan applications in order to determine whether borrowers had sufficient income to meet their monthly mortgage obligations.  Rather, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the underwriters' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting No Income No Assets ("NINA") and Stated Income Stated Assets ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted; and

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

77.     The originators of loans transferred to the trusts and the originators' agents, such as mortgage brokers, had become so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had altered the required documentation.

78.     Moreover, in many instances the income/employment verifications that were purportedly completed by the originators were insufficient because the clerical staff at the lenders typically did not have proper verification skills, the mortgage brokers or their agents often completed verifications that were suspect, and oftentimes verifications were provided by inappropriate contacts

at the borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of human resources). Unbeknownst to investors, these factors had the effect of dramatically increasing the risk profile of the Certificates.

79.      Similarly, those borrowers who were actually required to submit stated income applications would include income levels which were routinely inflated to extreme levels, relative to the stated job titles, in order to get the mortgage loans approved and funded. Inflation of stated income was so rampant that a study cited by Mortgage Asset Research Institute found that almost all stated-income loans exaggerated the borrower's actual income by 5% or more, ***and more than half increased the amount by more than 50%***.

80.      The originators' lack of underwriting controls essentially encouraged this type of income inflation. For instance, many stated income borrowers were actually wage earners who could have supplied W-2s or other income-verifying documentation, but did not. Numerous mortgages transferred to the trusts were issued without requiring the borrowers to execute a Form 4506, which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service, out of fear that they would then learn of information that was inconsistent with the income level that the borrower reported on his loan application.

81.      Further, the originators were not limiting their grant of reduced documentation loans to instances where borrowers could demonstrate "acceptable compensating factors." Instead, the originators were granting "reduced documentation" and "no documentation" loans to borrowers with high LTV ratios, low credit scores, and stated income that was not reasonable given the borrower's stated job title.

82.      In an October 2007 new conference, Nomura Holdings' president, Nobuyuki Koga, admitted to problems with Nomura' mortgage originators stating that: "'I think an unpredictable

change in market conditions was not the only factor behind the losses. We had constraints on our operations *because* of a *weak client base*. We needed to overhaul our US operations to beef up competitiveness . . . .'"

**FNBN's Underwriting Was Designed to Originate as Many Loans as Possible, Not to Honestly Evaluate the Borrower's Ability to Repay**

83.    FNBN – the key originator of loans in the Series 2006-AF1, 2006-AP1, and 2006-AR4 Alternative Loan Trusts – routinely violated the underwriting practices described above. *It was FNBN's practice to make Alt-A residential mortgage loans to borrowers who qualified on the basis of obviously false information and thus could not reasonably be expected to repay their loans, which FNBN sold to financial institutions including Nomura. FNBN's business model was simply to make as many loans as possible and then sell them as quickly as possible.* FNBN obtained loan packages (applications) from outside brokers in return for fee payments. After receiving each loan package, FNBN would process it, underwrite it to determine whether the loan should be funded, and then close and fund the loans that it approved. After the loans were closed and funded, FNBN sold them to third parties.

84.    The rule at FNBN was that "if they [the borrowers] qualify," then FNBN would approve and fund the loan. "*Qualify" meant the borrower's application needed to "just somehow" meet the qualification standards, rather than to follow what common sense would indicate about the applicant's ability to make payments on a large loan such as a home mortgage*. Alt-A loans were FNBN's niche. Potential borrowers would qualify for an Alt-A program simply by having a sufficient FICO credit score, and once that qualification was met, *FNBN's rule was "make it work*." FNBN offered a variety of Alt-A programs to fit different borrowers, depending on the borrower's credit score, the amount of documentation that was required or not required, and the LTV ratio.

85.    *As time went on, the "risk-taking became more and more brazen." "FNBN wanted to fund anything they could." There were "huge pressures from management in Arizona to fund any loan possible*."  FNBN had a practice of throwing "junk" in with "A paper" and hoping that it would not be discovered.

86.    In implementing its business model, FNBN maintained relationships with a large number of mortgage loan brokers throughout the U.S.  FNBN's Wholesale Account Executives managed the relationships with the brokers and worked with the brokers to help the brokers structure the loan applications.  The outside brokers and in-house Account Executives both received a commission based on the number of loans they closed.  The Account Executives went to the brokers' offices, reviewed the loan applications, and decided with the brokers on the figures to include for items such as income and assets in order to ensure the loan application met the qualifications.  *The Account Executives coached the brokers on how to set up the loan*.  FNBN's Loan Coordinators, who worked with the Account Executives, would act as coaches with the brokers when an Account Executive was unavailable.  The brokers, Account Executives, Loan Coordinators and Loan Managers all received bonuses based on the dollar amount of loans that were closed.  They received no bonuses for loans which were rejected.

87.    When FNBN received a loan application from a broker, the first step was to "scrub" the application.  There were eight or nine Loan Coordinators in the Warm Springs office whose main job was to "scrub" the applications.  *Loan scrubbing referred to the practice of finding and eliminating information from the loan package that would disqualify the potential borrower from FNBN's loan programs*.  As an example of "red flags," inconsistencies with the amount of "stated" (unverified) income on the application, such as payroll deposits showed up as asset verifications but

were noticeably lower than the stated income. ***FNBN Loan Coordinators were fired for failing to scrub disqualifying information from a loan package.***

88.    Alt-A loans were FNBN'S niche, and FNBN was known for this characteristic "on the street." ***Alt-A loans were made to borrowers who were "obviously unqualified to be able to repay them," and FNBN and its brokers qualified the borrowers by "creating the numbers to make things work*.*"***  There was great tension between the underwriters on the one hand and those who brought the loan packages to FNBN (*i.e.*, the brokers, Account Executives, Loan Coordinators and Loan Managers, all of whom received bonuses based on the dollar amount of loans that were closed). ***Supervisors would not support challenges to unqualified applicants, and income and asset numbers were "just made up" in order to ensure borrowers qualified for FNBN's loan programs*.**

89.    The difference between Alt-A and sub-prime was just the credit score.  The credit scores for Alt-A loans ran from about 580 to 620 (and 620 would not meet the A-paper lower limit). Sub-prime loans were available to borrowers with credit scores below 580.  A borrower could meet the Alt-A credit score guideline by simply having few credit purchases on his or her credit history or by being current.  However, the ability to remain current on several small loans was not necessarily indicative of an ability to keep current on payments of a large loan.  Thus, a high FICO score does not always mean the borrower has a high credit limit or reflect an ability to meet credit payments on a large loan.

90.    FNBN offered a variety of Alt-A programs, which differed mainly with respect to the required amount of documentation.  "Stated" loans referred to loans that could be approved for funding either without verification of the borrower's income or without verification of the borrower's assets.  A "stated-stated" loan did not require verification of income ***or*** assets. In addition

to income and asset numbers, the LTV ratio was also relevant to the Underwriter's judgment concerning loan approval.  As an underwriting guideline, 80% was the maximum LTV ratio, and mortgage insurance was required on loans above 80% LTV.  FNBN lent on so-called "piggyback" or "80-20" loans, which provided a second mortgage that covered the remaining 20% of the purchase price in lieu of the borrower providing a down-payment.  *However, the LTV ratio could always be reduced by increasing the appraised value of the property.  FNBN did some review of appraisals, but usually the Underwriting Supervisor worked to find comparable sales ("comps") that would increase the appraised value of the subject property, and thereby reduce the LTV ratio, in order to make the loan work.*

91.     FNBN regularly practiced "pricing up," which refers to the points paid by the borrower to obtain the loan.  Alt-A borrowers paid four or five points – meaning four to five percent of the total loan, on top of the loan amount – in order to get the loan, and sub-prime borrowers paid as much as six points to get the loan.  The minimum FICO score for a so-called "stated-stated" loan was about 580 in July 2006, and might have increased slightly by the beginning of 2007.  The market for loans tightened up a bit in terms of explicit qualification requirements, *but this tightening on the face of the requirements just resulted in more lying about the data on the borrowers' loan applications*.

92.     As an example of the lack of integrity in FNBN's mortgage loan approval process, FNBN underwrote the loan application of a person working in a motel as a housekeeper with "stated" (*i.e.*, unverified) monthly income of $5,000.  The underwriter took that loan application to her Underwriting Supervisor, Kari Stansel, and told *Stansel that she was going to deny the loan. Stansel replied with words to the effect that "we can work this out" or "we can back into this,"* meaning that it is possible to qualify the applicant by calculating a combination of hourly pay, over-

time pay, and the number of hours of regular work and overtime work that would generate a $5,000 monthly income. Stansel calculated the amounts for the wage rate, the amount of overtime, and the number of double shifts the applicant would have to perform during a month to earn $5,000. The underwriter told Stansel that it was "absolutely impossible" for any of that data to be true and told Stansel that, but Stansel would not "back-down." The underwriter refused to sign the form 1008 (the Fannie Mae transmittal form that accompanies the loan when the loan is sold) on this loan application. By signing that form, the underwriter affirms that the loan meets the underwriting standards. Stansel however must have signed the form as the loan was closed and funded.

93.    FNBN relied on its automated underwriting process, which detracted from (if not avoided completely) the opportunity for a skilled and experienced underwriter to perform a "manual" examination of the loan packages and detect instances where the borrower's financial information defied common sense. FNBN's lax or non-existent underwriting was tolerated by FNBN managers as FNBN avoided the risk associated with these risky loans by auctioning its residential mortgage loan pools to third-party investment banks such as Nomura. Nomura and other investment banks that purchased these loan pools received information in their files that revealed the lack of underwriting and the resulting problems with the underlying loans. These underwriting practices ultimately led to massive losses at FNBN, eventually rendering FNBN insolvent. As a result, regulators closed FNBN in July of 2008.

94.    FNBN's demise resulted from the collapse of its mortgage loan business model, when the revenues from its loan sales failed to cover its costs. FNBN held monthly auctions in which investors such as Nomura and other Wall Street institutions would bid for the loan pools, which ranged in amount between $100 million to $500 million, and perhaps more. FNBN or an affiliate

bank developed these loans through a network of brokers and then processed, underwrote and funded the loans, and then collected them into pools for sale.

95.     ***FNBN's goal was to originate and fund as many loans as quickly as possible***, and it used three channels to achieve that goal.  One channel was the retail channel, in which loans were made through direct contact with homebuilders and realtors and their home-buying customers, who would receive special credits for obtaining their mortgage loans from FNBN.  The second loan generation channel was a network of correspondent lenders with letters of credit, which financed the loans they originated and then sold them immediately to FNBN.  The third channel, which was larger than the first two, was FNBN's wholesale origination channel, in which brokers had direct contact with the borrowers, and FNBN received the loan package (application and other paperwork), processed, underwrote, and funded the loans.  FNBN account executives were used to recruit brokers who would drum up such business by persuading potential borrowers to sign up for a FNBN loan program.  FNBN dealt with hundreds of these brokers in its network across the country.

96.     FNBN used account executives to recruit and manage the brokers, and the account executives participated with the brokers in tailoring loan applications to make them fit particular loan programs.  FNBN paid a fee or commission for each funded loan the broker helped to originate, and also provided the brokers with health insurance to "tie them in" – that is, to make certain that FNBN "got the first look" at the loan packages, since the brokers also shopped their borrower prospects to FNBN's competitors.  ***Brokers were essentially "beer drinking bullies" who often used the most aggressive of sales tactics to cajole or coerce their targets.***  The brokers were equipped with a web-based tool to determine the extent to which a given prospective borrower could qualify for a particular loan program.  The brokers would run the loan application through the qualification software tool, and if the borrower would "pre-qualify," then FNBN would send the loan package to

its Underwriting Department, which was moving toward reliance on an automated underwriting process.  FNBN's underwriting software was similar to the product named "Desktop Software." *FNBN's reliance on the automated process would detract from, if not avoid, the opportunity for a skilled and experienced underwriter to perform a "manual" examination of the loan package and detect instances where the borrower's information defied common sense.*  The loans emerging successfully from the electronic underwriting process received an electronically generated approval, and the loan was closed and the necessary documents (as required by the particular state in which the property was located) were automatically generated.  *FNBN's business plan was to write as many loans as possible, as quickly as possible, and the automated system was essential to that plan.*

97.    In 2006, FNBN was originating more than $600 million in loans per month, which amounted to more than $7 billion in annual loan closings.  First National Bank of Arizona ("FNBA"), FNBN's sister bank, also originated loans that FNBN then sold  to investors such as Nomura.  The distinction between FNBN and FNBA (which was referred to internally as the "bad bank") was not material in day-to-day operations; rather, it was an attempt to engage in subterfuge by originating the loans through the Arizona charter and then selling the loan thru the Nevada charter.  The FDIC ultimately uncovered  this subterfuge and took both banks into receivership simultaneously via merging the two banks.

98.    As noted above, FNBN held monthly auctions attended by the major Wall Street firms that bought the loan pools to serve as collateral for their securitizations.  Nomura participated in these auctions.  FNBN's "Secondary Market Department guys" would "high-five" each other when the bids came in because often those offers showed more than a 100 basis point difference in the pricing offered by the half dozen or so bidders.  *The bid spread resulted because some firms used "Fraud Guard" or another fraud detection software tool that was available for about $8-$12*

*per loan.  **Nomura effectively did not conduct this type of due diligence.***  These fraud detection tools were commercially available, and they were as easy to use as software designed for background checks or credit score checks.  Vendors marketed this software at meetings such as the Mortgage Bankers Association and other gatherings attended by mortgage companies and investment banking companies that invested in mortgages.  ***Nomura received information in its files that indicated the poor quality of the loans and the lack of underwriting performed by FNBN. However, Nomura did little or no investigation and thus, the Trusts were inundated with loans which would never be repaid.***

99.    In order to continue originating risky loans, FNBN dispensed with contract underwriters connected to mortgage insurance companies and relied on in-house employee underwriters who they could control.  FNBN made this decision after due consideration of indications that the mortgage insurance companies would be making their underwriting guidelines more stringent.  One issue leading to the change was that the mortgage insurance companies were finding loans made to borrowers with minimum allowable FICO scores to be less creditworthy than was acceptable to the insurer, and therefore wanted to raise the FICO minimum for all loans.  Two mortgage insurers took the position that the FICO minimum for the most "vanilla" type loan, where the borrower could meet all of the other criteria, would be raised to approximately 660.  FNBN "balked at this," and then decided to make the change to in-house staff employee underwriters.  After FNBN took over the underwriting responsibility, FNBN dispensed with the mortgage insurance companies' guidelines and implemented underwriting guidelines it developed on its own. Generally, the FNBN underwriting guidelines were less stringent than those negotiated with the mortgage insurers and thus were more likely to permit otherwise unqualified borrowers to qualify for loans.

100.    FNBN thus diluted the mortgage insurers' guidelines when it dispensed with underwriting by the mortgage insurance companies and began relying on its own in-house underwriters.  Under the FNBN underwriting guidelines, the minimum FICO score requirement for a no-documentation loan was reduced substantially.  FNBN also moved toward 100% use of automated underwriting, using the "Avenue" program which the mortgage insurance companies did not trust and therefore would not use it.  In addition, FNBN chose not to use the Salary.com safeguard program as a check to determine whether stated income was accurate.

101.    FNBN's fast and loose loan origination practices were not surprising given that they were overseen by Raymond Lamb, FNBN's founder and majority shareholder of FNBN's holding company, First National Bank Holding Co., and Gary Dorris, former President and CEO of First National Bank Holding Co.  Prior to his involvement with FNBN, Dorris had a documented history of poor loan underwriting practices which contributed to the failure of at least one bank Dorris had worked for.  And Lamb and Dorris, in 2004, "were essentially banned for life from part of the lending industry" by the Office of Thrift Supervision due to inappropriate lending.

102.    Dorris' poor loan underwriting practices surfaced in the 1990s when the FDIC prohibited Dorris from becoming a Director and Chief Loan Officer at one of Lamb's Arizona banks due to Dorris' "unsafe and unsound" lending practices.  Dorris and Lamb challenged the FDIC's prohibition in an action styled *Dorris v. FDIC*, 93-1659 (D.D.C. 1994).  In upholding the FDIC's decision, the District Court pointed to Dorris' numerous instances of poor underwriting while he was employed at two banks – National Bank and Sun State Savings and Loan Association ("Sun State"). Specifically:

- The Federal Home Loan Bank Board ("FHLBB") and the Arizona State Banking Department examined a loan that Dorris recommended and characterized it as "***Substandard***."  These agencies "***noted deficiencies in Sun State's underwriting***, and stated that [one portion of the loan] was of 'particular concern.'"  Sun State's

internal auditor "criticized several aspects of [a second loan extended in a related transaction]."

- Sun State's internal auditor "***severely criticized***" a third loan that Dorris extended, finding "1) lack of financial information of the guarantors; 2) no financial analysis of the guarantors was documented; and, 3) the ***required underwriting and file documentation for the loan was not completed*** until three months after Dorris funded the loan." Both the Office of Thrift Supervision ("OTS") and Sun State's internal auditor classified this loan as "***Substandard***."

- Dorris' own staff criticized a fourth loan, concluding "that the ***borrower's self-prepared balance sheet was 'marginal at best***.'" The FDIC also criticized the loan because "Dorris had relied upon a one year old appraisal prepared on behalf of the borrower" when the real estate market had been in a long decline. The FHLBB concluded that the loan was "'***Substandard***' given the borrower's deteriorating position and the current depressed real estate market."

- While at National Bank, Dorris' poor underwriting practices continued. The Office of the Comptroller of Currency ("OCC") classified loans that Dorris extended as "***Substandard***" and "found that these loans demonstrated ***poor underwriting standards*** in many respects." An investigation by an outside auditor "was instigated after the OCC determined that the . . . ***loans were unsafe and unsound***." The auditor "was ***critical of the underwriting standards employed by Dorris***."

103.    The suspect practices described above did not end in the 1990s. In January of 2005, Lamb and Dorris opened a lending institution in New Mexico chartered by the OTS. However, within six months the OTS forced Lamb to dissolve the institution after engaging in "***lending inappropriate for an OTS-regulated lender***." As a result, Lamb and Dorris signed letters agreeing they would "'not participate or seek to participate as an institutional-affiliated party . . . of any savings association or any savings and loan holding company.'" This agreement "***barred [Lamb and Dorris] from the S&L business*** – a highly unusual sanction, regulators say."

**Silver State Mortgage Routinely Violated the Underwriting Practices Described in the Registration Statement and Prospectus Supplements**

104.    Mike Garner ("Garner"), a former employee of Silver State – a principal originator of loans for the Series 2006-AR3 and Series 2006-AR4 Alternative Loan Trusts, described these

practices during an interview on the radio program *This American Life*.  Garner described Silver

State's underwriting practices to the interviewer Alex Blumberg ("Blumberg"):

> Garner:  The next guideline lower is just stated income, stated assets.  Then
> you state what you make and state what's in your bank account.  They call and make
> sure you work where you say you work.  Then an accountant has to say for your field
> it is possible to make what you said you make.  But they don't say what you make,
> they just say it's possible that they could make that.
>
> Blumberg:  It's just so funny that instead of just asking people to prove what
> they make, there's this theater in place of you have to find an accountant sitting right
> in front of me who could very easily provide a W2, but we're not asking for a W2
> form, but we do want this accountant to say yeah, what they're saying is plausible in
> some universe.
>
> Garner: Yeah, and loan officers would have an accountant they could call up
> and say "Can you write a statement saying a truck driver can make this much
> money?"  Then the next one, came along, and it was no income, verified assets.  So
> you don't have to tell the people what you do for a living.  You don't have to tell the
> people what you do for work.  All you have to do is state you have a certain amount
> of money in your bank account.  And then, the next one, is just no income, no asset.
> You don't have to state anything.  Just have to have a credit score and a pulse.
>
> *        *        *
>
> Garner: Yeah.  And my boss was in the business for 25 years.  He hated those
> loans.  He hated them and used to rant and say, "It makes me sick to my stomach the
> kind of loans that we do."  He fought the owners and sales force tooth and neck about
> these guidelines.  He got same [the] answer.  Nope, other people are offering it.
> We're going to offer them too.  We're going to get more market share this way.
> House prices are booming, everything's gonna be good.  And . . . the company was
> just rolling in the cash.  The owners and the production staff were just raking it in.

105.    Prior to the issuance of the Registration Statements, the quality of Silver State's loans

declined, as Silver State offered a variety of loans that became increasingly more aggressive.  During

this time period Silver State's underwriting guidelines were consistent with its increasingly

aggressive loan programs and it became less stringent as if the loan programs and underwriting

guidelines were in a race to the bottom.  Many of the loans were "stated income" (no verification of

income), "stated asset" (no verification of assets), or "stated-stated" (no verification of either income

or assets).  In some cases a debt-to-income ("DTI") ratio was not even required, but when DTI was

required, it was permissible to calculate it using the stated income, if stated income was the income figure permitted by the loan program. Of course, using the stated income in the calculation of the DTI ratio meant that the DTI ratio was not verified. In checking a borrower's employment status, Silver State often could not verify that the borrower actually had a job because only the "employer's" mobile telephone number was provided and such numbers were not reliable for employment verification. Nevertheless, Silver State deemed such verification sufficient, and than sold the loans to secondary market investors including Nomura.

106.    Many of the loans sold to Nomura by Silver State were essentially blind loans without verification. Reviews of loan packages showed that it became very easy for borrowers to lie about their unverified loans and assets. Yet such loans were approved and funded because Silver State wanted to prevent disqualification of the loan. Some loan officers pushed borrowers into the loan product that was the easiest fit from an approval standpoint (rather than choose a product that was, from a payment standpoint, a rational choice for the borrower), or the product that carried the largest commission.

107.    The risk problem went beyond the fact that loan programs did not require verification. In some cases, verification of one piece of information provided evidence that an unverified piece of information could not be accurate, but that evidence was ignored both in Silver State's underwriting and in the due diligence review by secondary market investors including Nomura. Loan files often contained conflicting information with respect to stated income and assets yet the loans were still conveyed to secondary investors, including Nomura. The lack of verification and the acceptance of conflicting information led to unqualified borrowers obtaining loans which were transferred to Nomura.

108.     Silver State permitted appraisers to use a questionable method of determining comparable property value ("comps").  This technique used comps from higher priced areas not within the neighborhood of the property under appraisal.  This maneuver helped attain the objective of justifying a higher appraisal value for the borrower's property, and thus increased the likelihood that the loans would be approved.

109.     Silver State set up a group within its business to qualify suspect applicants for loans. The group, known as the Conditions Group, attempted to cure conditions that otherwise would disqualify a loan from acceptance by the investor purchasing the pool of loans that Silver State was offering for sale in the secondary market.

110.     Silver State made loans where the stated income was not believable and no verification was required or provided.  Fictitious income figures were accepted by Silver State as they would re-sell the loans to secondary investors such as Nomura who did little if anything to verify the underwriting used to generate the underlying loans.  In addition to stated income loans, there were also stated asset loans, where the borrowers stated their assets but for which no verification was required or provided.  These loans were often very questionable because of the absence of verification and the unreasonable nature of the assets asserted.  Underwriters repeatedly signed off on these blind loans.

111.     Silver State's loan programs were very aggressive.  You could get a loan if you "[j]ust ha[d] . . . a credit score and a pulse."  Whatever deficiencies a prospective borrower might have, there was a loan program that could avoid disqualification on the basis of those deficiencies. Silver State made 100% LTV loans for "investment property," referring to residential properties that were purchased by persons who did not intend to live in them, but intended to rent them out or resell them.

- 40 -

112.    Silver State's questionable underwriting practices are the subject of a number of lawsuits against it alleging that it sold defective loans to the secondary market.  These lawsuits were brought by entities – including CitiMortgage, Inc. ("CMI"), Indymac Bank, F.S.B. ("Indymac"), Terwin Advisors LLC ("Terwin") and UBS Real Estate Securities Inc. ("UBS Securities") – who purchased loans originated by Silver State.  The defects alleged include misrepresentations of borrowers' income and assets, misrepresentations regarding occupancy status, defective appraisals, and a large number of early payment defaults.

113.    In a lawsuit styled *CitiMortgage, Inc. v. Silver State Financial Services, Inc., d/b/a Silver State Mortgage*, No. 4:07-cv-01533 (E.D. Mo. 2008), CMI alleged that between 2004 and 2006, Silver State sold 48 loans to CMI:

> (a) that were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation made by the borrower, Silver State, Silver State's directors, officers, employees, agents, independent contractors and/or affiliates; (b) where CMI has discovered discrepancies regarding property ownership, mortgage or other debts, and occupancy; (c) that suffer[ed] from first payment/early payment defaults; and/or (d) that have turned out to be otherwise defective or not in compliance with the CMI Manual or trade confirmation.

114.    The *CitiMortgage* lawsuit resulted in a $12,118,344.78 default judgment being entered against Silver State.

115.    In a lawsuit styled *Indymac Bank, F.S.B. v. Silver State Mortgage*, No. 2:07-cv-00405 (D. Nev. 2007), Indymac alleged that in 2006, Silver State sold 36 loans to Indymac, 35 of which had at least one of the following defects:

- Were Early Payment Defaults because the borrowers did not make their first payment after Indymac's purchase of the loan, and failed to make a timely payment to anyone within the first three months after Indymac's purchase of the loan;

- Contained misrepresentations of borrower's income and assets;

- Contained misrepresentations of the occupancy status of the subject property;

- Contained defective appraisals;

- 41 -

- Had incomplete documentation – including incomplete purchase contracts and/or deeds of trust;

- Were "flip transactions" in that the property had sold within the preceding nine months at an increased price with no explanation for the increased value; and

- Title issues were not resolved prior to the sale as required in the preliminary title report.

116.    In a lawsuit styled *Terwin Advisors LLC, et al. v. Silver State Financial Services, Inc., et al.*, No. 1:07-cv-03647 (S.D.N.Y. 2007), Terwin alleged, inter alia, that a number of the loans it purchased from Silver State between 2004 and 2007 were early payment defaults. The court entered a default judgment against Silver State in the amount of $4,498,517.91.

117.    In a lawsuit styled *UBS Real Estate Securities Inc. v. Silver State Financial Services, Inc. d/b/a Silver State Mortgage*, No. 1:07-cv-03702 (S.D.N.Y. 2007), UBS Securities alleged that a number of loans it purchased from Silver State between 2005 and 2007 were early payment defaults. On January 15, 2008, the court entered a default judgment against Silver State in the amount of $2,955,603.55.

118.    Additionally, the Nevada Mortgage Lending Division launched an investigation into the collapse of Silver State in February of 2007. By March of 2007, Scott Bice, Nevada's Mortgage Lending Commissioner, said his agency's investigation revealed some evidence of fiduciary mismanagement at Silver State and moved to revoke the mortgage broker licenses of Michael Stoddart and Lynn Woodrum, Silver State's owners.

**MILA, Inc.'s Underwriting Practices Were Similarly Misrepresented**

119.    Similar allegations of defective underwriting practices were made against MILA, Inc. ("MILA") – a principal originator of loans in the AR-1 trust. In a lawsuit styled *CitiMortgage, Inc. v. MILA, Inc.*, No. 4:06-cv-01586 (E.D. Mo. 2006), CMI alleged that between 2005 and 2006, MILA sold CMI 52 loans that contained one or more of the following defects:

(a) were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation[s] made by the borrower, MILA, MILA's directors, officers, employees, agents, independent contractors and/or affiliates; (b)contained discrepancies regarding property ownership, mortgage or other debts, and occupancy; (c) were subject to first payment defaults; and/or (d) have turned out to be otherwise defective or not in compliance with the CMI Manual or trade confirmation.

120.    In a second lawsuit by CMI against MILA – this one styled *CitiMortgage, Inc. v. MILA, Inc.*, No. 4:07-cv-00989 (E.D. Mo. 2007) and brought after the 2006 settlement between CMI and MILA – CMI alleged that between 2005 and 2006, MILA sold CMI an additional 35 loans (not addressed in the first *CMI v. MILA* lawsuit and subsequent settlement) that contained one or more of the following defects:

(a) were underwritten and/or originated based upon materially inaccurate information or on material misrepresentation[s] made by the borrower, MILA, MILA's directors, officers, employees, agents, independent contractors and/or affiliates; (b) contained discrepancies regarding property ownership, mortgage or other debts, and occupancy; and/or (c) [that] have turned out to be otherwise defective or not in compliance with the CMI manual or trade confirmation.

121.    The court entered a default order against MILA in this case in 2007.

**Metrocities Mortgage, LLC's Underwriting Practices Were Similarly Misrepresented**

122.    Similar allegations of defective underwriting practices were made against Metrocities – a principal originator for the 2006-AF1, 2006-AF2, and 2006-AR2 Alternative Loan Trusts.    In a lawsuit styled *Carmen v. Metrocities Mortgage Corporation d/b/a Metrocities Mortgage, LLC, et al.*, No. 1:08-cv-02729 (D.N.J. 2008), the *Carmen* plaintiffs alleged that Metrocities did not follow its own underwriting guidelines and approved loans with inaccurate appraisals and false DTI and LTV ratios.

123.    In a lawsuit styled *Aldridge, et al. v. Premium Connections, Inc., et al.*, No. 2:08-cv-359 (M.D. Fla. 2008), the *Aldridge* plaintiffs alleged that Metrocities' affiliate – Opteum – and other defendants misstated borrower income to support loan applications.

124.    In a lawsuit styled *Merrill Lynch Mortgage Capital, Inc., et al. v. Metrocities Mortgage Corp.*, No. 650089/2007 (N.Y. Sup. Ct. 2007), Merrill Lynch Mortgage Lending, Inc. ("MLML") alleged that a number of mortgage loans that Metrocities sold to MLML were "Early Payment Defaults" in that the mortgagor was delinquent on the first monthly payment due to MLML.  Metrocities was not conducting sufficient underwriting of the loans it originated and sold.

**Wells Fargo's Underwriting Practices Were Similarly Misrepresented**

125.    Wells Fargo – the sole originator of loans in the 2006-WF1 Alternative Loan Trust – also engaged in defective underwriting practices.  Contrary to the representations in the Prospectus Supplement for that Trust, Wells Fargo's underwriting standards were not concerned with the borrower's ability to repay their loan.  Wells Fargo's departure from its underwriting standards was highlighted in a lawsuit styled *Mayor and City Counsel of Baltimore v. Wells Fargo Bank, N.A., et al.*, No. 08-cv-062 (D. Md. 2008), that alleged Wells Fargo extended loans without regard to "the borrower's ability to repay."  This case is currently pending.

126.    Also contrary to the representations in the Prospectus Supplement, Wells Fargo did not, for its "stated income" loans, ensure that "[t]he borrower's income as stated must be reasonable for the borrower's occupation as determined in the discretion of the loan underwriter."  Rather, as alleged in a lawsuit styled *Wells Fargo Bank, N.A. v. Quicken Loans, Inc.*, No. 2:08-cv-12408 (E.D. Mich. 2008), Wells Fargo expected that their borrowers would overstate their income on "stated income" loan applications and that these borrowers would not have the ability to make their monthly mortgage loan payments.  In fact, contrary to the representations in the 2006-WF1 Prospectus Supplement, Wells Fargo viewed verification of its borrowers' income as unnecessary given the appreciating value of homes.

127.    Wells Fargo acknowledged its poor underwriting practices in its 2007 Annual Report. In a section entitled "Credit Quality: What We Did Wrong," Wells Fargo noted:

- 44 -

We made some mistakes . . . Too many of our home equity loans had "loan-to-value" ratios that were too high . . . . Sometimes we did not require full documentation for these home equity loans we purchased from brokers because these were prime borrowers who had high credit scores with lower expected risk of default. . . .

. . . We should not have offered such lenient loan terms . . . , and we made the mistake of taking on too much risk. We should have known better.

**The Registration Statements and Prospectus Supplements Falsely Stated that No Mortgage Loan Will Be More than 30 Days Delinquent**

128.    The April 19, 2006 Registration Statement provided that "[n]o Mortgage Loan will be more than 30 days delinquent as of the Cut-Off Date."

129.    The Prospectus Supplement for Alternative Loan Trust, Series 2006-AP1, Series 2006-AR3, Series 2006-AR4, and Series 2006-WF1 stated "[n]o Mortgage Loan will be more than 30 days delinquent as of the Cut-Off date."

130.    The Prospectus Supplement for the 2006-AF1, 2006-AF2, and 2006-AR2 Alternative Loan Trust stated "[n]one of the Mortgage Loans will be more than 30 days delinquent."

131.    ***Omitted Information***:  The above statements were materially false and misleading because the defendants failed to disclose that dozens of the mortgage loans that Nomura Asset acquired – with an aggregate value of over $10 million – were already more than 30 days delinquent as of the cut-off date. For example, as of the cut-off date, Alternative Loan Trust, Series 2006-WF1 contained at least 55 loans that were at least 30 days delinquent. These 55 loans represented more than 1.24% of the total number of loans contained in the trust and had an outstanding balance of $7,381,361.36. Similarly, as of the cut-off date: Alternative Loan Trust, Series 2006-AR3 contained at least four loans that were at least 30 days delinquent. These loans had an outstanding balance of $1,586,650.00; Alternative Loan Trust, Series 2006-AR4 contained at least two loans that were at least 30 days delinquent. These loans had an outstanding balance of $499,350.00; Alternative Loan Trust, Series 2006-AP1 contained at least two loans that were at least 30 days delinquent. These

- 45 -

loans had an outstanding balance of $321,500.00; Alternative Loan Trust, Series 2006-AF2 contained at least one loan that was at least 30 days delinquent. This loan had an outstanding balance of $325,850.00.

**The Registration Statements and Prospectus Supplements Misrepresented the Nature of the Appraisals Conducted Prior to the Issuance of the Underlying Mortgages**

132. The Registration Statements contained representations concerning the appraised value of the properties securing the loans and the methods by which these appraised values were obtained.

133. Independent and accurate real estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in MBS with supposedly independent and accurate assessments of the value of the mortgaged properties. Accurate appraisals ensure that a mortgage or home equity loan is not under-collateralized, thereby protecting borrowers from financially overextending themselves and protecting lenders and investors in MBS in the event a borrower defaults on a loan. Accurate appraisals also provide investors with a basis for assessing the price and risk of MBS.

134. An accurate appraisal is also critical in determining the LTV. If a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

135. A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he/she defaults on the loan. Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

136. To ensure the accuracy of appraisals, USPAP impose certain requirements on appraisers. With respect to real estate appraisals, the USPAP provide:

- 46 -

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

[In appraisal practice,] [a]n appraiser must not advocate the cause or interest of any party or issue.

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\*          \*          \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

    1.  the reporting of a predetermined result (e.g., opinion of value);

    2.  a direction in assignment results that favors the cause of the client;

    3.  the amount of a value opinion;

    4.  the attainment of a stipulated result; or

    5.  the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

137.    The April 19, 2006 Registration Statement contained a number of representations regarding appraisals of the property underlying the mortgage loans. These representations included the following:

The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator. *All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation [i.e., USPAP's requirements]* and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator. The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the Mortgaged Property and to verify whether the Mortgaged Property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property.

- 47 -

138.    Each of the Prospectus Supplements also contained statements that appraisals performed in the assessment of the underlying collateral for the mortgage loans conformed to the USPAP.  In that regard, the Prospectus Supplements stated, in pertinent part, as follows:

> The adequacy of the Mortgaged Property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  ***All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac***.  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by or acceptable to the originator.  ***The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed***.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis . . . based on the current cost of constructing or purchasing a similar property.

139.    ***Omitted Information***:  The appraisals failed to comply with USPAP requirements and yielded inaccurate appraised values as a result.  For retail or in-house mortgage loan origination, the originators allowed the sales personnel or account executives to order and control the appraisals.  These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible.  As noted by Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking, this dynamic created a "terrible conflict of interest" where appraisers "experience systemic problems with coercion."  This coercion included, contrary to USPAP standards, lenders and/or their agents (such as mortgage brokers) pressuring appraisers to come back with pre-determined, pre-conceived, artificially high – and false – appraisal values and appraisers being  "ordered to doctor their reports."  Appraisers who did not submit to these pressures were told that they would "never see work from those parties again" and were placed on "'blacklists' or 'exclusionary appraiser' lists."  This pressure succeeded in generating

artificially high appraisals and appraisals being done on a "drive-by" basis where appraisers issued their appraisal without reasonable bases for doing so.

140.    A 2007 survey of 1,200 appraisers found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  This figure was nearly double the findings of a similar study conducted just three years earlier.  The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."  Adding to these problems was the fact that lenders, for originations completed by mortgage brokers, generally lacked *knowledge of the accuracy of the appraisals* since they were typically located far from the actual property and knew very little about the general area where the property was located.

141.    Similarly, due to hidden incentives by sellers and a lack of due diligence on the part of the originators, loans were frequently based on an erroneous belief that the home supporting the loan was worth more than it really was.  For example, Silver State extended two mortgage loans to a buyer, totaling $176,400 – $19,600 more than the home was worth.  Based on the recorded price, this property had a LTV of approximately 90% ($176,400/$196,000).  However, taking into account the true price of the home, the true LTV was 105% ($176,400/$168,400).  This activity was commonplace and impacted each of the Trusts at issue.

142.    As but one other example, Wells Fargo provided $599,800 in financing – *$130,800 more than the asking price for a home just two months before its sale*.  Based on the recorded price of nearly $600,000, the property had a LTV of approximately 100% ($599,800/$600,000).  However, taking into account the true price of the home, *the true LTV ratio was approximately 128%*.  As a result of this conduct there was rampant inflation of the appraised value of homes underlying loans which were transferred to the Trusts at issue.

- 49 -

**The Prospectus Supplements Misstated the True Loan-to-Value Ratios Associated with the Underlying Mortgages**

143.    Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts.  In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.  The following chart, taken from page S-48 of the May 25, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AF1, is representative of the type of LTV ratio information provided in each of the Prospectus Supplements:

**Original Loan-to-Value Ratio of the Group I Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Remaining Principal Balance | % of Aggregate Remaining Principal Balance | Gross Coupon | FICO | Original LTV | Stated Remaining Term |
|---|---|---|---|---|---|---|---|
| Less than or equal to 50.00 | 104 | $   18,818,253 | 4.43% | 6.602% | 681 | 39.89% | 328 |
| 50.01 - 55.00 | 28 | 8,423,108 | 1.98 | 6.596 | 698 | 52.63 | 354 |
| 55.01 - 60.00 | 43 | 9,883,786 | 2.33 | 6.698 | 677 | 58.10 | 345 |
| 60.01 - 65.00 | 85 | 22,387,208 | 5.27 | 6.912 | 673 | 63.43 | 350 |
| 65.01 - 70.00 | 200 | 59,480,636 | 14.00 | 7.274 | 689 | 69.26 | 351 |
| 70.01 - 75.00 | 136 | 37,004,556 | 8.71 | 7.636 | 678 | 74.44 | 353 |
| 75.01 - 80.00 | 947 | 249,358,905 | 58.70 | 7.468 | 688 | 79.79 | 353 |
| 80.01 - 85.00 | 14 | 2,296,271 | 0.54 | 7.589 | 694 | 82.79 | 355 |
| 85.01 - 90.00 | 51 | 8,565,287 | 2.02 | 7.983 | 688 | 89.80 | 353 |
| 90.01 - 95.00 | 47 | 8,448,731 | 1.99 | 8.105 | 709 | 94.98 | 354 |
| 95.01 - 100.00 | 1 | 101,581 | 0.02 | 8.875 | 0 | 97.00 | 357 |
| Total: | 1,656 | $  424,768,320 | 100.00% | 7.377% | 687 | 74.70% | 352 |

144.    ***Omitted Information***:  As explained above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated.  Furthermore, due to hidden incentives, the stated sales price of properties underlying the mortgage loans did not accurately reflect the true value of the properties.  These inflated appraisals and misleading sales price figures were used to form the LTV ratios listed in the prospectus supplements.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).  Due to the inflated appraisals, the

LTV ratios listed in the prospectus supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.

145.    The Prospectus Supplements also stated that in addition to the "full/alternate" underwriting guidelines, the originators originate or purchase loans

> that have been originated under certain limited documentation programs designed to streamline the loan underwriting process . . . [that] may not require income, employment or asset verifications. Generally, in order to be eligible for a limited or no documentation program, **the mortgaged property must have a loan-to-value ratio that supports the amount of the mortgage loan** and the prospective borrower must have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion.

146.    **Omitted Information**: Due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount of the mortgage loan.  Further, contrary to the statement that these "limited documentation" loans were extended to borrowers who "have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion," the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.

- Failing to determine whether stated income or stated assets were reasonable.

**The Prospectus Supplements Misstated the Certificates' True Investment Rating**

147.    The Registration Statements and Prospectus Supplements contained statements regarding the ratings of the Certificates that were supported by the mortgage loans. The Registration Statements referred the investor to the Prospectus Supplements for specific information as to the ratings for each of the Certificates.

148.    Each of the Prospectus Supplements provided: (1) both Standard & Poor's Rating Services' ("S&P") and Moody's Investors Services, Inc.'s ("Moody's") actual rating for each class of Certificate within a Trust; or (2) stated that the Certificates in each class would not be offered unless they received ratings from both Moody's and S&P that were at least as high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB) and the majority of Certificate classes received the highest rating of Aaa/AAA.

149.    The following chart, taken from the May 25, 2006 Prospectus Supplement for Alternative Loan Trust, Series 2006-AF1, is an example of the first type of representation:

| Class | | Approximate Initial Certificate Principal Balance[1] | Initial Pass-Through Rate % | Ratings (S&P / Moody's) |
|---|---|---|---|---|
| *Group I Offered Certificates* | | | | |
| I-A-1A | $ | 155,442,000 | Floating[2][3] | AAA/Aaa |
| I-A-1B | $ | 30,000,000 | 5.89400[3] | AAA/Aaa |
| I-A-2 | $ | 95,809,000 | 6.15900[3] | AAA/Aaa |
| I-A-3 | $ | 25,756,000 | 6.40800[3] | AAA/Aaa |
| I-A-4 | $ | 40,953,000 | 6.63400[3][4] | AAA/Aaa |
| I-A-5 | $ | 41,764,000 | 6.26800[3][4] | AAA/Aaa |
| I-A-IO | | Notional[5] | 4.50000[3][6] | AAA/Aaa |
| I-M-1 | $ | 11,256,000 | 6.46600[3][4] | AA/Aa2 |
| I-M-2 | $ | 9,344,000 | 6.66400[3][4] | A/A2 |
| I-M-3 | $ | 8,070,000 | 6.95000[3][4] | BBB+/Baa2 |
| *Group II-V Offered Certificates* | | | | |
| Class II-A | $ | 22,383,000 | 6.39880[7] | AAA/Aaa |
| Class III-A-1 | $ | 139,053,000 | 6.63868[8] | AAA/Aaa |
| Class III-A-2 | $ | 15,450,000 | 6.63868[8] | AAA/Aaa |
| Class IV-A-1 | $ | 40,608,000 | 6.39754[9] | AAA/Aaa |
| Class IV-A-2 | $ | 4,512,000 | 6.39754[9] | AAA/Aaa |
| Class V-A | $ | 27,133,000 | 6.32849[10] | AAA/Aaa |
| Class C-B-1 | $ | 8,259,000 | 6.53967[11] | AA/Aa2 |
| Class C-B-2 | $ | 4,874,000 | 6.53967[11] | A/A2 |
| Class C-B-3 | $ | 3,114,000 | 6.53967[11] | BBB/Baa2 |

150.    The April 19, 2006 Registration Statement further states:

As to each series of securities, the mortgage loans will be selected for inclusion in the mortgage pool based on rating agency criteria.

*            *            *

As a condition to the issuance of any class of Offered Notes or Offered Certificates, as applicable, they must not be rated lower than investment grade; that is, they must be rated in one of the four highest rating categories, by a rating agency.  Ratings on mortgage pass-through certificates and mortgage-backed notes address the likelihood of receipt by security holders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with the Notes or Certificates, as applicable, the nature of the underlying assets and the credit quality of the guarantor, if any.

151.    ***Omitted Information***:  The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

- 53 -

**The Models that Produced the Certificates' Ratings Were Based upon Outdated Assumptions Regarding Loan Performance**

152.    Moody's and S&P used models to produce the ratings for the Certificates.  These models were based upon loan performance prior to the year 2000.  However, an unprecedented decrease in mortgage lending standards occurred after 2000.  For instance, from 2001 through 2005: (i) the percentage of "subprime" mortgage loans tripled; (ii) the combined LTV ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" adjustable rate mortgages quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for '"second homes" more than tripled; (viii) the percentage of loans including "silent seconds" – a nearly non-existent phenomenon a few years prior to the issuance of the Certificates – experienced over a 16,000% increase; and (ix) the volume of non-traditional mortgages more than quintupled.

153.    This decrease in lending standards and increase in exotic mortgage products during the 2001 through 2005 time period rendered Moody's and S&P's pre-2000 loan performance data obsolete.  However, these agencies did not update their models to reflect these changes.  Thus, by the time the agencies provided "investment grade" certifications to the Certificates in late 2005 (for the 2006-AP1 Trust) and throughout 2006 (for the remainder of the Trusts), their historical data no longer reflected market realities and that mortgage credit quality was rapidly deteriorating.

154.    Moody's and S&P continued to use these outmoded models even though more current and accurate models were available.  According to Frank Raiter – the Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000 (particularly Alt-A type loans).  These models better captured the changes in the post-2000 mortgage

landscape and were therefore better at determining default risks posed by these new mortgages. However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest ratings market share amongst the three major rating agencies). As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market." The current President of S&P, Deven Sharma, agreed, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

155.    Executives at Moody's also acknowledged a lack of investment in Moody's rating models and the failure of Moody's rating models to capture the decrease in lending standards. In a confidential presentation to Moody's Board of Directors, Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment." McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

156.    Not only were Moody's and S&P's models based on outmoded data but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating. And in some instances real estate investments were graded by analysts who never

actually reviewed the investment and who merely relied upon ratings assigned by a competitor rating agency.

**The Rating Agencies' Relaxing of Ratings Criteria Led to Artificially High Ratings for the Certificates**

157.    In addition to using flawed models to generate ratings, Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  A former S&P Managing Director – Richard Gugliada – explained the easing of standards as a "'***market-share war where criteria were relaxed***'" and admitted, "'***I knew it was wrong at the time . . . [i]t was either that or skip the business***.  That wasn't my mandate.  My mandate was to find a way.  Find the way.'"  According to Gugliada, when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher, said: "'Don't kill the golden goose.'"

158.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to the Trusts:

>   Shah:  btw – that deal is ridiculous

>   Mooney:  i know right . . . ***model def does not capture half of the rish*** [sic]

>   Mooney:  ***risk***

>   Shah:  ***we should not be rating it***

>   Mooney:  ***we rate every deal***

>   Mooney:  ***it could be structured by cows and we would rate it***

>   Shah:  but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

159.    In an email, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] ***even bigger***

***monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters.***"

160.    The loosening of ratings criteria due to market share considerations was evident at Moody's also.  Jerome Fons, a former Managing Director for Credit Quality at Moody's, indicated that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

161.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "***typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality***."  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "***prevented analysts from putting investor interests first***."

162.    Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards.  In a presentation to Moody's Board of Directors in October 2007, McDaniel told the Board: "The real problem is not that the market . . . underweights ratings quality but rather that in some sectors, it actually penalizes quality . . . .  It turns out that ***ratings quality has surprisingly few friends***."  He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different rating firm.

163.    As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, *Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter*."

164.    The SEC found that one of the rating agencies "reduced its model's raw loss numbers for second lien loans based upon internal matrices . . . [and] *did not publicly disclose its use of matrices to adjust model outputs*."   An employee from a second rating agency described the departure from its own published rating criteria, stating: "'*It might be too much of a stretch to say that we're complying with [our published criteria]* because our SF [structured finance] rating approach is inherently flexible and subjective, while much of our written criteria is detailed and prescriptive. *Doing a complete inventory of our criteria and documenting all of the areas where it is out of date or inaccurate would appear to be a huge job* . . . .'"  This rating agency also maintained a published "criteria report" that was no longer being used in its ratings process.  The criteria report stated the rating agency conducted an extensive review of origination and servicing operations and practices, though it no longer did so.  At a third rating agency, in certain instances there was a time lag from the date at which the firm implemented changes to its criteria and the date at which it published notice of these changes to the market.  And the SEC uncovered emails indicating that this rating agency's analysts utilized an unpublished model to assess data.

**Due to Defects in the Underwriting Process, Inaccurate Data Was Entered into the Rating Models Thereby Yielding Inaccurate Ratings**

165.    In addition to the eroding rating standards and the flawed rating models described above, Moody's and S&P's ratings were based on inaccurate information.  The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that Nomura provided to them – including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As discussed

above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting addressed in this Complaint. Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities). Nor did they seek representations from sponsors that due diligence was performed. During a "Town Hall Meeting" hosted by Moody's Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the rating agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true. . . . [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law. We know that's a lie.

> *       *       *

> There's a lot of fraud that's involved there, things that we didn't see. . . . We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

> *       *       *

> [W]e're being asked to figure out how much everyone lied. . . . [I]f all of the information was truthful and comprehensive and complete, we wouldn't have an issue here. . . .

> What we're really being asked to do is figure out how much lying is going on and bake that into a credit . . . which is a pretty challenging thing to do. I'm not sure how you tackle that from a modeling standpoint.

166.    In response to the "Town Hall Meeting," a Moody's employee noted:

> [W]hat really went wrong with Moody's sub prime ratings leading to massive leading to massive downgrades and potential more downgrades to come? We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets. As for #1, it seems to me that *we had blinders on and never questioned the information we were given*. Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan? As for #2, *it is our job to think of the worst case scenarios and model*

*them* . . . .  ***Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both***.

167.     Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk, and Certificates were given investment grade ratings when in reality they were not of investment grade quality.  As such, the statements regarding the ratings of the Certificates were false and misleading.

168.     The problems identified above were not disclosed to the public prior to the summer of 2007 and resulted in artificially high ratings for the Certificates.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

**Disclosures Emerge About Problems with the Loans Underlying the Certificates**

169.     On July 17, 2007, Moody's announced a possible downgrade of Nomura Asset Alternative Loan Trusts, Series 2006-AF2, 2006-AR1 and 2006-AR2.

170.     On October 15, 2007, Nomura Holdings disclosed that it would be shutting down its U.S. mortgage loan business.  Nomura Holdings expected to report a pre-tax loss of ¥40-60 billion ($340-$510 million) for the July-September quarter, including about ¥15 billion ($128 million) to reorganize its U.S. business.  Combined with previous write-offs, Nomura Holdings was taking more than $1.2 billion of the write-offs on residential mortgages in the United States.  The value of Nomura Holdings' positions in the MBS market in October 2007 was ¥14 billion, down from ¥48 billion at the end of September 2007 and ¥266 billion at the end of June 2007.  Nomura Holdings said it will cut more than 400 jobs in the U.S. – about 30% of its work force there – by March 2008, mostly in its broker-dealer operations and back offices.

171.     Nomura Holdings acknowledged that the problem arising from its mortgage loan business stemmed from weak borrowers who were issued mortgage loans they could not afford.  On

October 15, 2007, Nomura Holdings president Nobuyuki Koga told a news conference, "'I think an unpredictable change in market conditions was not the only factor behind the losses. We had constraints on our operations because of *a weak client base*. We needed to overhaul our US operations to beef up competitiveness . . . .'" Nomura Holdings sold $1.7 billion of U.S. sub-prime mortgages at a loss as delinquencies on home loans rose to a five-year high.

172. On October 25, 2007, Nomura Holdings posted a ¥10.5 billion ($92 million) loss for the July-September quarter, due to the sub-prime mortgage crisis in the United States. The latest quarterly net loss came on top of $620 million Nomura Holdings had already written off in its U.S. residential MBS business.

173. On November 13, 2007, Moody's downgraded numerous classes of Certificates of Nomura Asset Alternative Loan Trusts, including Series 2006-AP1, 2006-AF1, 2006-AF2, 2006-AR1, 2006-AR2, 2006-AR3, 2006-AR4 and 2006-WF1.

174. On December 10, 2007, Moody's downgraded the ratings of certain investments backed by sub-prime home loans issued by Wells Fargo because borrowers were having problems keeping up with payments, raising concerns that Wells Fargo's underwriting practices were suspect.

175. Meanwhile, the delinquency and foreclosure rates on the underlying mortgage loans have skyrocketed. Each Trust has reported that both the 60+ days delinquent percentage (which represents the percentage of loans that are 60 or more days delinquent, REO (Real Estate Owned) or in foreclosure) and the foreclosure percentage has at least doubled from June 2007 to November 2008. During that period, one of the trusts, 2006-AR4, experienced a 970% increase in the number of loans in foreclosure and a 580% increase in the number of loans that are 60+ days delinquent. As of November 2008, more than 40% of the mortgage loans underlying the 2006-AR2 loan pool are 60+ days delinquent and more than 20% of them are in foreclosure.

176.    As of November 2008:

The 2006-AF1 60+ day delinquency rate was 27.86% (versus 8.34% in June 2007) and 14.70% of the mortgage pool was in foreclosure (versus 5.26% in June 2007).

The 2006-AF2 60+ day delinquency rate was 36.21% (versus 9.22% in June 2007) and 18.66% of the mortgage pool was in foreclosure (versus 5.99% in June 2007).

The 2006-AP1 60+ day delinquency rate was 21.06% (versus 7.75% in June 2007) and 11.14% of the mortgage pool was in foreclosure (versus 4.96% in June 2007).

The 2006-AR1 60+ day delinquency rate was 32.15% (versus 8.10% in June 2007) and 14.16% of the mortgage pool was in foreclosure (versus 3.09% in June 2007).

The 2006-AR2 60+ day delinquency rate was 40.83% (versus 8.50% in June 2007) and 20.21% of the mortgage pool was in foreclosure (versus 5.68% in June 2007).

The 2006-AR3 60+ day delinquency rate was 29.34% (versus 5.51% in June 2007) and 13.04% of the mortgage pool was in foreclosure (versus 3.17% in June 2007).

The 2006-AR4 60+ day delinquency rate was 33.29% (versus 5.68% in June 2007) and 17.97% of the mortgage pool was in foreclosure (versus 1.84% in June 2007).

The 2006-WF1 60+ day delinquency rate was 25.69% (versus 6.78% in June 2007) and 11.92% of the mortgage pool was in foreclosure (versus 4.05% in June 2007).

177.    On December 20, 2007, *Reuters* reported that the Nomura Holdings securities were the worst performing securities backed by Alt-A mortgage loans.  The article stated that severe delinquencies on the $4 billion in Alt-A mortgage bonds issued by Nomura Holdings hit 9.83% in September 2007, more than twice the 4.61% average.

## COUNT I
### For Violations of §11 of the 1933 Act
### Against All Defendants

178.    Plaintiffs repeat and reallege the allegations above as if set forth fully herein.  For purposes of this cause of action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.  This cause of action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

179.    The Registration Statements for the Certificate offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

180.    Each of the Defendant Issuers are strictly liable to Plaintiffs and the Class for the misstatements and omissions complained of herein.

181.    The Individual Defendants signed the Registration Statements, which were false due to the misstatements described above.

182.    Each of the Defendants listed in ¶¶16-21 and 185-190 below was an underwriter of the Certificates and sold and marketed these investments to members of the Class.

183.    None of these Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

184.    By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

185.    Nomura Securities was the underwriter for the following issuances:

2006-AF1          2006-AF2
2006-AP1          2006-AR1
2006-AR2          2006-AR3
2006-WF1

186.    UBS was the underwriter for the following issuance:

2006-AR4

187.    GCM was the underwriter for the following issuances:

2006-AF2          2006-AR4

188.    Merrill Lynch was the underwriter for the following issuance:

2006-AF2

189.    Citigroup was the underwriter for the following issuance:

2006-WF1

190.    Goldman Sachs was the underwriter for the following issuance:

2006-AR3

191.    Plaintiffs and the Class acquired the Certificates pursuant and/or traceable to the

Registration Statements and Prospectus Supplements.

192.    Plaintiffs and the Class have sustained damages as the value of the Certificates has

declined substantially subsequent to the disclosures of Defendants' misconduct.

193.    At the time of their purchases of the Certificates, Plaintiffs and other members of the

Class were without knowledge of the facts concerning the wrongful conduct alleged herein and

could not have reasonably discovered those facts prior to the summer of 2007.  Less than one year

elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon

which this Complaint is based and the time that Plaintiffs filed the initial complaint in this action.

Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed the initial complaint in this action.

## COUNT II
### For Violations of §12(a)(2) of the 1933 Act
### Against All Defendants

194.    Plaintiffs repeat and reallege the allegations above as if set forth fully herein.  For purposes of this cause of action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

195.    By means of the defective Prospectus Supplements, Defendants promoted and sold the Certificates to Plaintiffs and other members of the Class.

196.    The Prospectus Supplements contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiffs and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Supplements as set forth above.

197.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Prospectus Supplements at the time they acquired the Certificates.

198.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements sustained substantial

- 65 -

damages in connection with their purchases of the Certificates.  Accordingly, Plaintiffs and the other members of the Class who hold the Certificates issued pursuant to the Prospectus Supplements have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to the Defendants sued herein.  Class members who have sold their Certificates seek damages to the extent permitted by law.

**COUNT III**
**For Violations of §15 of the 1933 Act**
**Against the Individual Defendants and Nomura Asset**

199.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

200.    This cause of action is brought pursuant to §15 of the 1933 Act against the Individual Defendants and Nomura Asset.

201.    Each of the Individual Defendants was a control person of Nomura Asset and of the Trusts by virtue of his position as a director and/or senior officer of Nomura Asset.  The Individual Defendants were responsible for the preparation of the contents of the Registration Statements which incorporated by reference the statements in the Prospectus Supplements.

202.    Each of the Individual Defendants was a culpable participant in the violations alleged herein, based on his having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the offerings detailed herein.

203.    Nomura Asset was the depositor and the Issuer for the offerings.  The Defendants named herein were responsible for overseeing the formation of the Trusts as well as the operations of the Trusts, including routing payments from the borrowers to investors.

204.    Nomura Asset and the Individual Defendants prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

Determining that this action is a proper class action and certifying Plaintiffs as Class Representatives;

Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

Awarding rescission or a rescissory measure of damages; and

Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  January 20, 2009          COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
                               ARTHUR C. LEAHY (admitted *pro hac vice*)
                               SCOTT H. SAHAM (admitted *pro hac vice*)
                               SUSAN G. TAYLOR
                               JARRETT S. CHARO
                               NATHAN R. LINDELL (admitted *pro hac vice*)


                                     s/ Scott H. Saham
                                    SCOTT H. SAHAM

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
artl@csgrr.com
scotts@csgrr.com
susant@csgrr.com
jcharo@csgrr.com
nlindell@csgrr.com

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
CAROLINA C. TORRES
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@csgrr.com
drosenfeld@csgrr.com
ctorres@csgrr.com

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
GAVIN M. BOWIE
1100 Connecticut Avenue, N.W., Suite 730
Washington, DC  20036
Telephone:  202/822-6762
202/828-8528 (fax)
gbowie@csgrr.com

Lead Counsel for Plaintiff

SHAPIRO HABER & URMY LLP
THOMAS G. SHAPIRO (BBO # 454680)
ADAM M. STEWART (BBO # 661090)
53 State Street
Boston, MA  02109
Telephone:  617/439-3939
617/439-0134 (fax)
tshapiro@shulaw.com
astewart@shulaw.com

Liaison Counsel

- 68 -

CAVANAGH & O'HARA
PATRICK O'HARA
State Bar No. 03123235
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)
patrick@cavanagh-ohara.com

Additional Counsel for Plaintiff

S:\CasesSD\Nomura Asset\CPT00056574_Amen.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 20, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 20, 2009.

s/ Scott H. Saham
SCOTT H. SAHAM

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  scotts@csgrr.com

# Mailing Information for a Case 1:08-cv-10446-RGS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sarah Heaton Concannon**
  sconcannon@goodwinprocter.com

- **Arthur C. Leahy**
  artl@csgrr.com,jcharo@csgrr.com

- **James T. Lux**
  james.lux@wilmerhale.com

- **William H. Paine**
  william.paine@wilmerhale.com

- **Timothy J. Perla**
  timothy.perla@wilmerhale.com

- **Stephen D. Poss**
  sposs@goodwinprocter.com

- **David A. Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H. Rudman**
  dgonzales@csgrr.com,E_File_SD@csgrr.com

- **Scott H. Saham**
  scotts@csgrr.com,jillk@csgrr.com,nlindell@csgrr.com

- **Thomas G. Shapiro**
  tshapiro@shulaw.com,kacheson@shulaw.com

- **Adam M. Stewart**
  astewart@shulaw.com

- **Carolina C. Torres**
  ctorres@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Nathan R. Lindell
Coughlin Stoia Geller Rudman & Robbins  LLP
655 West Broadway
Suite 1900
San Diego, CA 92101
```