UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10446-RGS

PLUMBERS' UNION LOCAL NO. 12
PENSION FUND, Individually and on behalf
of all others similarly situated

v.

NOMURA ASSET ACCEPTANCE
CORPORATION, et. al

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

September 30, 2009

STEARNS, D.J.

On January 31, 2008, Plumbers' Union Local No. 12 Pension Fund (Plumbers'

Union) brought this putative class action in Suffolk Superior Court.  On September 25,

2008, after the case was removed by defendants to this court, two additional plaintiffs,

Plumbers & Pipefitters' Welfare Educational Fund (Pipefitters) and NECA-IBEW Health &

Welfare Fund (NECA), published notice to the prospective class.[1]  Plaintiffs allege that

defendants violated sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (Act) in

---

[1] Plaintiffs filed an Amended Complaint on June 30, 2008.  Defendants moved to strike the Amended Complaint for lack of standing and for failure to comply with the notice, certification, and lead plaintiff requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §§ 77z-1(a)(2) and (a)(3)(A).  Defendants additionally filed a motion to dismiss for failure to state a claim.  After the Pipefitters and NECA published notice, defendants withdrew their motions without prejudice with the knowledge that plaintiffs would shortly file yet another Amended Complaint.  During the notice period, no additional security holders came forward.  Plaintiffs moved for their appointment as lead plaintiffs and for selection of a lead counsel.  The court granted the motion on December 19, 2008.  The pending Consolidated Amended Complaint was filed on January 20, 2009.

connection with the sale of mortgage pass-through certificates (Certificates) of defendant Nomura Asset Acceptance Corporation (Nomura).   Before the court are defendants' motions to dismiss.[2]   The court heard oral argument on July 20, 2009.

BACKGROUND

The Certificates at issue in this litigation are a type of mortgage-backed security. Nomura established eight Alternative Loan Trusts (ALTs or Trusts) to hold pools of mortgages and issue the Certificates.   As the name implies, the loans backing the Certificates were classified mainly as alternative loans (Alt-A loans).   On July 22, 2005, and April 19, 2006, Nomura filed registration statements in connection with the Trusts' sale of the Certificates.   Eight separate offerings were made pursuant to eight prospectuses supplementing the two registration statements.   Under the investment scheme, a Certificate holder was to receive a portion of the interest and/or principal payments from a specific pool of mortgage loans aggregated in a particular Trust.

The three institutional investor plaintiffs purchased Certificates with a total face value of $340,000.   Plumbers' Union purchased a single Certificate with a face value of $115,000 from ALT 2006-AF1.   Pipefitters purchased a single Certificate with a face value

---

[2]There are nineteen moving defendants.  In addition to Nomura, they are eight trusts in which mortgages were pooled: ALT 2006-AF1; ALT 2006-AF2; ALT 2006-AP1; ALT 2006-AR1; ALT 2006-AR2; ALT 2006-AR3; ALT 2006-AR4; and ALT 2006-WF1; the following underwriters: Nomura Securities International, Inc. (NSI); Greenwich Capital Markets, Inc. (Greenwich); UBS Securities LLC (UBS); Citigroup Global Markets Inc. (Citigroup); Merrill Lynch, Pierce, Fenner & Smith Incorporated (Merrill Lynch); Goldman, Sachs & Co. (Goldman Sachs); and four individuals, all of whom are (or were) directors and/or officers of Nomura: John P. Graham, Nathan Gorin, John McCarthy, and David Findlay.   Although Shunichi Ito was named in the Complaint, defendants state (and plaintiffs do not claim otherwise) that Ito, a citizen and resident of Japan, has never been served with process.

of $115,000 from ALT 2006-AP1.  NECA purchased two Certificates - the first with a face

value of $55,000 from ALT 2006-AP1, and the second with a face value of $55,000 from

ALT 2006-AF1.

On July 17, 2007, in the midst of the sub-prime mortgage crisis, Moody's Investors

Services (Moody's) announced a possible downgrade of certain of Nomura's Trusts: series

2006-AF2; 2006-AR1; and 2006-AR2.  On October 15, 2007, Nomura Holdings announced

that it would immediately close its U.S. mortgage loan business and that it expected to

report a pre-tax loss of $340 to $510 million.  Nobuyuki Koga, the President of Nomura

Holdings, stated, "I think an unpredictable change in market conditions was not the only

factor behind the losses.  We had constraints on our operation because of a weak client

base."  On November 13, 2007, Moody's downgraded numerous classes of Nomura

Certificates, including those within ALTs 2006-AP1 and 2006-AF1.  On December 20,

2007, Reuters reported that the Nomura Holdings securities were the worst performing

securities backed by Alt-A mortgage loans.  This litigation followed on the heels of the

publication of the Reuters article.

<u>APPLICABLE LAW</u>

Sections 11 and 12(a)(2) of the Securities Act of 1933 impose liability on signers

of registration statements and underwriters in certain defined circumstances.  Section 11

provides that every signer and underwriter may be held liable for a registration statement

which "includes untrue statements of material facts or fails to state material facts

necessary to make the statements therein not misleading."  <u>Ernst & Ernst v. Hochfelder</u>,

425 U.S. 185, 208 (1976).  Section 12(a)(2) provides that any person who "offers or sells"

3

a security by means of a prospectus or oral communication containing a materially false statement or that "omits to state a material fact necessary to make the statements, in the light of the circumstances under which they were made, not misleading," shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77 l(2).

To defeat defendants' motion to dismiss the section 11 claim, plaintiffs must successfully allege "(1) that [defendants'] prospectus contained an omission [or misrepresentation]; (2) that the omission [or misrepresentation] was material; (3) that defendants were under a duty to disclose the omitted information; and (4) that such omitted information existed at the time the prospectus became effective." Cooperman v. Individual, Inc., 171 F.3d 43, 47 (1st Cir. 1999). In the context of a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations of the complaint must "possess enough heft" to set forth "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 559 (2007); Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008). As the Supreme Court has recently emphasized, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (internal citations and quotation marks omitted).

DISCUSSION

1. Standing

    A. Constitutional and Statutory Standing

4

Before turning to the merits, the court must first determine whether plaintiffs have standing to bring some or all of the claims asserted in the Consolidated Amended Complaint.  Plaintiffs seek to represent a class consisting of all persons who purchased Certificates issued by the eight defendant Trusts.  However, plaintiffs in the aggregate purchased Certificates issued by only two of the Trusts: ALT 2006-AP1 and ALT 2006-AF1.  It is undisputed that the eight Trusts are separate legal entities and that each issued its own securities backed by different pools of mortgages.

To invoke the court's subject matter jurisdiction, plaintiffs must present a justiciable "Case[]" or "Controvers[y]."  U.S. Const. art. III, § 2, cl. 1; Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990).  The case or controversy requirement of Article III is the "irreducible constitutional minimum" of standing.  Bennett v. Spear, 520 U.S. 154, 162 (1997).  To show standing a plaintiff must demonstrate that it has personally suffered: (1) an injury-in-fact; (2) that is fairly traceable to defendants' alleged misconduct; and (3) is likely to be redressed by a favorable decision.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).  "Standing is a threshold inquiry and is particularly important in securities litigation, where strict application of standing principles is needed to avoid vexatious litigation and abusive discovery."  Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100, 118 (D. Mass. 2006).

In Forsythe, plaintiffs sought to represent a class of shareholders invested in sixty-two separate mutual funds.  However, the named plaintiffs owned shares in only two of the funds. The court held that plaintiffs had no standing to sue on behalf of funds that they did not own.  See id. at 119.  See also Stegall v. Ladner, 394 F. Supp. 2d 358, 363 (D. Mass.

5

2005) (plaintiff cannot claim "injury suffered by funds in which he had no ownership interest. [He is not permitted] to bootstrap claims arising out of investment decisions made in relation to other funds in which he was not a participant."). The same bedrock principle applies here.

While plaintiffs maintain that standing is an issue to be resolved at the class certification stage, "[a] plaintiff may not avoid the standing inquiry merely by styling his suit as a class action." Forsythe, 417 F. Supp. 2d at 119. Here, the named plaintiffs are incompetent to allege an injury caused by the purchase of Certificates that they themselves never purchased. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured," Lewis v. Casey, 518 U.S. 343, 357 (1996), and "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Warth v. Seldin, 422 U.S. 490, 502 (1975). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." O'Shea v. Littleton, 414 U.S. 488, 494 (1974). "[A] named plaintiff cannot acquire standing in an action by bringing a cause of action on behalf of others who would have had standing had they been named plaintiffs." Nenni v. Dean Witter Reynolds, Inc., 1999 WL 34801540, at *2 (D. Mass. Sept. 29, 1999), citing Allee v. Medrano, 416 U.S. 802, 829 (1974). See also In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) ("[T]he Article III standing determination should precede that of class certification. With regard to the sixty-eight funds of which Plaintiffs own no shares,

6

Plaintiffs do not have standing to assert any claims because Plaintiffs cannot satisfy the standing requirements.").

To hold otherwise would shunt aside the inevitable risk that "any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim." In re Eaton Vance Corp. Sec. Lit., 220 F.R.D. 162, 169 (D. Mass. 2004) (citation omitted). Learned commentators agree:

> The named plaintiff in a class action must meet all the jurisdictional requirements to bring an individual suit asserting the same claims, including standing. . . . If a complaint includes multiple claims, at least one named plaintiff class representative must have Article III standing to raise each claim. When no named representative has standing at the time the suit is brought, the court should dismiss the suit for lack of jurisdiction notwithstanding the class allegations.

5 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 23.63[1][b] (3d ed. 2008).

Given the overwhelming weight of authority, the claims brought on behalf of prospective class members who have acquired securities from ALTs 2006-AF2; 2006-AR1; 2006-AR2; 2006-AR3; 2006-AR4; and 2006-WF1 must be DISMISSED.  Necessarily, the five underwriters of these Trusts (which are not implicated in the remaining allegations of the Consolidated Amended Complaint), that is, Goldman Sachs, Merrill Lynch, UBS, Citigroup, and Greenwich, must also be DISMISSED.[3]

_____

[3]The court notes that plaintiffs lack statutory as well as constitutional standing to bring claims against the six Trusts from which they did not purchase securities.  The Act permits claims to be brought only by persons who purchased the securities at issue.  See 15 U.S.C. § 77k(a) (limiting section 11 claims to "any person acquiring such security"); 15 U.S.C. § 77l(a)(2) (limiting recovery to "the person purchasing such security").  Because plaintiffs did not purchase securities from the six "outlying" Trusts, they do not have statutory standing to bring suit.

B. <u>Section 12(a)(2) Claims</u>

Defendants next argue that the section 12(a)(2) claims must be dismissed - even as to those Certificates that plaintiffs actually purchased - because of plaintiffs' failure to plead that the purchases were made directly in a public offering, rather than in the aftermarket. <u>See</u> <u>Gustafson v. Alloyd Co., Inc.</u>, 513 U.S. 561, 578 (1995) (limiting section 12 liability to "public offerings").[4]  A plaintiff has standing to bring a section 12(a)(2) claim only against the person or entity from whom he directly purchased a security, including one who engaged in "active solicitation of an offer to buy." <u>Pinter v. Dahl</u>, 486 U.S. 622, 645 (1988). Here, plaintiffs allege that they "acquired" securities "pursuant and/or traceable to" the registration statements and prospectus supplements.  This precise pleading language -

––––––––––––––––––

[4] Prior to the enactment of the PSLRA, section 12(a)(2) of the Act was section 12(2). <u>See</u> <u>In re Sonus Networks Inc. Sec. Litig.</u>, 2006 WL 1308165, at *5 n.7 (D. Mass. May 10, 2006).  According to section 12(a)(2):

> Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2).

"issued pursuant to, or traceable to the [Notes Offering and] Registration Statement" - was rejected by another court for its failure to squarely allege that the securities at issue were purchased in a public offering.  See In re WRT Energy Sec. Litig., 1997 WL 576023, at *5-6 (S.D.N.Y. Sept. 15, 1997), vacated on other grounds, 75 Fed.Appx. 839 (2d Cir. 2003).  If plaintiffs did in fact purchase the Certificates directly from the defendants, they should have said so.  An evasive circumlocution does not suffice as a substitute.  The section 12(a)(2) claims will therefore be DISMISSED.

    2.  The Merits

       There are four general categories of material misrepresentations and/or omissions that are allegedly contained in the registration statements and prospectus supplements. Each will be discussed in turn.

      A.  Underwriting Standards

       Plaintiffs first allege that the registration statements falsely stated that the originators' underwriting standards were intended to insure that prospective borrowers were creditworthy.  Specifically, plaintiffs cite language in the prospectus supplements for ALT 2006-AF1 and ALT 2006-AP1, stating that the key originator, First National Bank of Nevada (FNBN), adhered to "underwriting guidelines [that] are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan," and that these guidelines "are applied in a standard procedure that is intended to comply with federal and state laws and regulations."  With regard to Metrocities Mortgage, the prospectus supplement for ALT 2006-AF1 stated that its "[u]nderwriting Guidelines are primarily

intended to evaluate the prospective borrower's credit standing and repayment ability." The April 29, 2006 registration statement also offered the assurances that

> [g]enerally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower. As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information . . . .

> Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property . . . .

Plaintiffs argue that these statements (and others of a similar tone) were materially false and misleading because the underwriting standards (such as they were) of the originating banks were never intended to filter out potentially risky borrowers. Rather, plaintiffs argue that the banks were hellbent on originating as many loans as possible with an eye to short-term profit without any regard to the ability of the borrowers to repay.

Plaintiffs, however, omit numerous warnings flagging the permissive underwriting practices underlying the mortgage pools contained in the 2006-AP1 and 2006-AF1 prospectuses. For example, the prospectuses stated that

> [t]he underwriting standards applicable to the Mortgage Loans typically differ from, and are, with respect to a substantial number of Mortgage Loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, credit score, required documentation, interest rates, borrower occupancy of the Mortgaged Property, and/or property types.

They additionally warned that "[t]he underwriting standards applicable to the Mortgage Loans . . . may or may not conform to Fannie Mae or Freddie Mac guidelines.  As a result, the Mortgage Loans may experience rates of delinquency, foreclosure and borrower bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in strict compliance with Fannie Mae or Freddie Mac guidelines."

The offering materials specifically addressed the underwriting practices of FNBN and Metrocities, the originators of the Trusts at issue, admitting that

> [a]ll of the mortgage loans have been originated either under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide).

The prospectuses also pointed out that "FNBN . . . originates or purchases loans that have been originated under certain limited documentation programs designed to streamline the loan underwriting process.  These . . . programs may not require income, employment or asset verifications."[5]  The prospectuses were no less forgiving with respect to Metrocities, stating that "[a]ll of the Mortgage Loans which were originated by Metrocities were originated generally in accordance with . . . underwriting criteria . . . which are different from

---

[5]According to plaintiffs, regulators closed FNBN in July of 2008.  Plaintiffs make numerous allegations about FNBN's allegedly unethical practices, including the "scrubbing" of loan applications and working in conjunction with mortgage brokers who plaintiffs describe as "beer drinking bullies."  See Consolidated Amended Complaint, at ¶¶ 83-103.  However, most of plaintiffs' allegations - which are all uncited, unsubstantiated hearsay- refer to conduct at FNBN that is alleged to have occurred in the 1990's.  Plaintiffs offer nothing in the Consolidated Amended Complaint to tie the alleged conduct to the loans at issue in this litigation.

and, in some cases, less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac. . . . The programs other than Full Documentation may not require income, employment or asset verification."[6]

In addition to the fusillade of cautionary statements, the offering materials revealed the fact that the vast majority of the loans securing the 2006-AP1 and 2006-AF1 Certificates had been originated under limited documentation programs and that the borrower's income as a result had not been verified.[7]  Plaintiffs' argument that they were not on notice of the originator's "soft" underwriting practices begs credulity.  The offering materials "abound[] with warnings" of the potential perils.  Glassman v. Computervision Corp., 90 F.3d 617, 629 (1st Cir. 1996).  See also Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 416 (1st Cir. 1989) (plaintiff's claim that statements were materially misleading "fails because in light of the later Agreement and Prospectus, he could not reasonably have relied upon them.").

B.  Appraisals / Loan-to-Value (LTV) Ratios

Plaintiffs next allege that the registration statements misrepresented the originators' appraisal assessment practices.  The prospectus supplements stated that

----

[6]At risk of flogging a dead horse, the court notes that with deathless repetition the materials warned *ad seriatum*: "Certain Mortgage Loans were underwritten to nonconforming underwriting standards, which may result in losses or shortfalls to be incurred on the Offered Certificates."  Under the heading "The Mortgage Pool-Modified Standards," came the caution that "[i]nvestors should note that changes in the values of the Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner."  And so on.

[7]Out of the 1,774 loans in the 2006-AP1 mortgage pool, 1,487 (or 84 percent) were subjected to limited documentation only.  Out of the 1,656 loans in the 2006-AF1 mortgage pool, 1,411 (or 85 percent) of the loans were subjected to limited documentation only.

> [a]ll appraisals conform to the Uniform Standards of Professional Appraisal
> Practice [USPAP] adopted by the Appraisal Standards Board of the Appraisal
> Foundation and must be on forms acceptable to Fannie Mae and/or Freddie
> Mac. . . . The appraisal procedure guidelines generally will have required the
> appraiser or an agent on its behalf to personally inspect the property and to
> verify whether the property was in good condition and that construction, if
> new, had been substantially completed.

Plaintiffs claim that the above statements omitted the fact that the appraisals failed in reality

to comply with USPAP requirements, and yielded inaccurate property values as a result.

In this regard, plaintiffs rely on a statement made by Alan Hummel, the Chair of the

Appraisal Institute,[8] in testimony before the Senate Committee on Banking that "appraisers

experience systemic problems with coercion" because originators often allowed sales

personnel - whose motivation was to close as many loans as possible - to dictate the

appraisal values.[9]

Not only do plaintiffs neglect to mention the date of Hummel's testimony, they offer

nothing that suggests the testimony had any bearing on the two Trusts at issue.  That

questionable appraisal practices were a common problem in the industry as a whole,

without more, tells nothing about the Trusts' underlying loans.  "To permit a plaintiff, on

such a skimpy foundation, to drag a defendant past the pleading threshold would be to

invite litigation by hunch and to open [defendants] to the most unrestrained of fishing

---

[8]Although plaintiffs do not explain, the "Appraisal Institute" is presumably the private Chicago-based international association of real estate appraisers.

[9]Plaintiffs additionally rely on an undocumented 2007 survey of 1,200 appraisers, in which 90 percent of the appraisers interviewed stated that they had been at one time or another pressured to raise property values to enable deals to be closed.  Even assuming that this survey is credible, defendants cannot be faulted for failing to call attention to the results of a 2007 survey in registration materials issued in 2005 and 2006.

13

expeditions." <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 515 (1st Cir. 1988). In any event, plaintiffs cannot credibly claim a lack of fair warning. The offering materials clearly disclosed that "[a]ppraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by the originator."[10]

Plaintiffs' fallback argument is that although the prospectus supplements stated that "the mortgaged property must have a loan-to-value ratio that supports the amount of the mortgage loan," the inflated appraisal values in fact resulted in lower LTV ratios.[11] Plaintiffs claim that the LTVs listed in the prospectus supplements were artificially low, making it appear that the loans underlying the Trusts were not as speculative as they in fact were. This claim fails for the evident reason that it is dependent upon plaintiffs' unsubstantiated allegations that the offering materials were misleading with regard to the appraisal methods utilized. As the offering materials warned, "the underwriting standards applicable to mortgage loans under an 'alternative' mortgage loan underwriting program . . . include higher loan amounts [and] higher maximum loan-to-value ratios . . . ."

      C. <u>Loan Delinquency</u>

Plaintiffs' third allegation is that defendants falsely stated that no loan included in the Trusts would be greater than 30 days delinquent. The registration statement and the

---

[10]Plaintiffs offer specific allegations regarding two loans that Silver State and Wells Fargo financed for amounts greater than the value of the underlying properties. Neither of these loans, however, was pooled in ALT 2006-AP1 or ALT 2006-AF1.

[11]By way of example, if a borrower seeks to borrow $90,000 for a house worth $100,000, the LTV ratio is 90 percent. If the appraisal is inflated to $120,000, the LTV ratio drops to 75 percent.

prospectus supplements for the two Trusts did in fact state that "[n]o mortgage will be more than 30 days delinquent as of the Cut-Off Date." As plaintiffs note, ALT 2006-AP1 contained at least two loans that were delinquent more than 30 days, with an outstanding combined balance of $321,500. (There are no allegations of delinquent loans held by the 2006-AF1 Trust).[12] Although defendants point to several warnings in the offering materials that delinquencies might result from lax underwriting standards and fluctuations in property values, the court assumes that the statements regarding the 2006-AP1 Trust were false in light of the two delinquent loans, and that plaintiffs relied on these statements. Plaintiffs, however, have failed to offer any facts to support a finding that the misrepresentations were material.

Information is "material" only if its disclosure would alter the "total mix" of facts available to the investor and "if there is a *substantial likelihood* that a reasonable shareholder would consider it important to the investment decision." Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992), quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-232 (1988) (emphasis in the original). With rare exception, the issue of whether a statement or omission was material is committed to the finder of fact. Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 176 (1st Cir. 1994). As a result, a court will review the complaint on a motion to dismiss "only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality." In re Cabletron Sys., Inc., 311 F.3d 11, 34 (1st Cir. 2002). Here, there is no plausible question of materiality. The

---

[12]Plaintiffs claim that Nomura acquired mortgage asset loans with an aggregate value of over $10 million that were more than 30 days delinquent as of the Cut-Off Date. Again, however, none of these loans was pooled in the 2006-AP1 or the 2006-AF1 Trusts.

2006-AP1 mortgage pool consisted of 1,774 loans with an aggregate principal balance of approximately $431 million. The two delinquent loans amounted to approximately 0.1 percent of the loans in the 2006-AP1 mortgage pool, and an even smaller 0.07 percent of the aggregate principal balance. See Glassman, 90 F.3d at 633 n.26 (an omission is immaterial when it reflects a very minor, low percentage discrepancy).

### D. Certificates' Investment Rating

Finally, plaintiffs allege that defendants misrepresented the investment ratings of the Certificates. Each of the prospectus supplements listed: (1) the Standard & Poor's Rating Services (S&P), and Moody's ratings for each class of Certificate within a Trust; or (2) stated that no Certificates in the class would be offered unless it received ratings from both S&P and Moody's that were at least as high as the ratings set out in the prospectus supplements.[13] According to plaintiffs, the ratings listed in the prospectus supplements were based on: (1) outdated models applicable only to years prior to 2000; (2) lowered ratings criteria; and (3) inaccurate loan information. Plaintiffs argue that the deterioration of lending standards and the introduction of "exotic" mortgage products in the years between 2001 and 2005 rendered Moody's and S&P's ratings meaningless. While that may be true, plaintiffs do not allege that defendants inaccurately reported the actual ratings awarded by Moody's and S&P.

Plaintiffs' allegations rest on uncited and undated after-the-fact admissions and laments by purported insiders. Richard Gugliada, a former managing director of S&P, is

---

[13]All of the ratings set out in the prospectus supplements were within the "Investment Grade" range of both Moody's (Aaa through Baa3) and S&P (AAA through BBB).

said to have remarked (it is not said to whom) that S&P had eased its standards to capture market share.  Plaintiffs also quote emails and instant messages exchanged by two S&P analysts including statements such as, "we rate every deal . . . it could be structured by cows and we would rate it."  Plaintiffs further allege that Jerome Fons, a former managing director for Credit Quality at Moody's, admitted to the deliberate relaxation of ratings standards at his company.  Raymond McDaniel, the current CEO of Moody's, is similarly quoted as saying, "What happened in '04 and '05 with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter."  Finally, plaintiffs allude to negative findings by the Securities and Exchange Commission with respect to "one of the rating agencies," as well as criticisms of a "second" and "third" rating agency (none of which are identified in the Consolidated Amended Complaint).

A securities case must be dismissed where a complaint merely pleads subsequent facts and developments in the attempt to establish an inference that these eventualities must have been known (or knowable) to defendants on the effective date of the registration statement.  See, e.g., Suna v. Bailey Corp., 107 F.3d 64, 70 (1st Cir. 1997) (complaint ineffectually asserted that the post-registration reduction in demand by a primary customer indicated earlier knowledge on the part of defendants that such a reduction was likely to occur).  None of the purported comments made by S&P and Moody's employees in the wake of the collapse of the sub-prime mortgage market (in 2007) "support the inference" that the ratings were compromised as of the dates (in 2005 and 2006) when the registration statements and prospectus supplements became effective.  Cooperman, 171 F.3d at 47.

Moreover, plaintiffs were duly cautioned that "[t]he security ratings assigned to the Offering Certificates should be evaluated independently from similar ratings on other types of securities.  A security rating is not a recommendation to buy, sell or hold securities."

In sum, plaintiffs have failed to allege a sufficient factual basis to support their claims of Securities Act violations.  See Gooley, 851 F.2d at 515 (dismissal appropriate where, "despite multiple opportunities to finetune the complaint, a naked conclusion, unanchored in any meaningful set of factual averments" is the asserted basis for relief).

    4. Section 15 Claims

Section 15 of the Securities Act of 1933 establishes joint and several liability for "controlling persons" – that is, those who exercise control over primary violators of sections 11 and/or 12. See 15 U.S.C. § 77o. Because plaintiffs have failed to state a claim of a primary violation, it follows that they have failed to state a claim under section 15. See Cooperman, 171 F.3d at 52.

CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are ALLOWED.  The Consolidated Amended Complaint is DISMISSED with prejudice.  The Clerk will enter judgment for defendants and close the case.

    SO ORDERED.

    /s/ Richard G. Stearns

    _____

    UNITED STATES DISTRICT JUDGE