UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10446-RGS

PLUMBERS' UNION LOCAL NO. 12 PENSION FUND, Individually and On
Behalf of All Others Similarly Situated

v.

NOMURA ASSET ACCEPTANCE CORP., et al.

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION
TO PROCEED WITH LITIGATION AND DEFENDANTS' RENEWED
MOTION TO DISMISS

October 1, 2012

STEARNS, D.J.

Before the court is Plumbers' Union Local No. 12 Pension Fund's[1] (Plumbers'

Fund) motion to proceed with litigation begun more than four years ago against

defendants, who were the issuers and underwriters of mortgage-backed securities

purchased by plaintiffs. Also pending is defendants' (renewed) motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). On January 20, 2011, the First

Circuit affirmed this court's previous dismissal of claims against a plethora of

additional defendants with one category of exceptions – "those [claims] relating to

---

[1] Plumbers' Fund is one of three "lead plaintiffs." The other two are Plumbers'
& Pipefitters' Welfare Educational Fund (Pipefitters' Fund) and NECA-IBEW Health
& Welfare Fund (NECA-IBEW).

the statements regarding the lending banks' underwriting practices," made by the remaining defendants.[2]  These, the Court of Appeals remanded with instructions.  *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011).[3]

Consistent with the appellate mandate, on June 13, 2011, the court gave leave to plaintiffs to take limited preliminary discovery on the surviving claims involving the First National Bank of Nevada (FNBN).  *See* Dkt # 89.  Armed with new facts unearthed during that discovery, plaintiffs attempt to remake their case for pursuing violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C.

---

[2] Only Nomura Asset Acceptance Corp. (Nomura), Nomura Securities International, Inc. (Nomura Securities), Alternative Loan Trust 2006-AF1, Alternative Loan Trust 2006-AP1, and officers and directors John P. Graham, Nathan Gorin, John McCarthy, and David Findlay remain as defendants.  The court's previous dismissal of claims against Alternative Loan Trust 2006-AF2, Alternative Loan Trust 2006-AR1, Alternative Loan Trust 2006-AR2, Alternative Loan Trust 2006-AR3, Alternative Loan Trust 2006-AR4, Alternative Loan Trust 2006-WF1, Greenwich Capital Markets, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., UBS Securities LLC, Citigroup Global Markets, Inc., and Goldman, Sachs & Co., was affirmed by the First Circuit.

[3] "While this case presents a judgment call, the sharp drop in the credit ratings after the sales and the *specific* allegations as to [the First National Bank of Nevada] offer enough basis to warrant some initial discovery aimed at these precise allegations.  The district court is free to limit discovery stringently and to revisit the adequacy of the allegations thereafter and even before possible motions for summary judgment."  *Plumbers' Union Local No. 12 Pension Fund*, 632 F.3d at 773-774 (emphasis in original).

§§ 77k(a), 77*l*(a)(2), 77o (2006), based on Nomura's alleged misstatements and

omissions with respect to FNBN's underwriting of loans included in the purchased

trusts.[4]   Defendants, for their part, dispute the weight and relevance of plaintiffs'

proffered evidence and independently renew the motion to dismiss on grounds that

did not figure in the prior appeal.  A hearing on the parties' competing motions was

held on September 5, 2012.

## DISCUSSION

### *Plaintiffs' Motion to Proceed with Litigation*

The court is guided by the following language taken from the First Circuit's

opinion.

> Plaintiffs first point to a set of statements in the offering documents
> implying that the banks that originated the mortgages used lending
> guidelines to determine borrowers' creditworthiness and ability to repay
> the loans.  For example, the prospectus supplements for the two trusts
> at issue stated that First National Bank of Nevada ("FNBN"), one of the
> "key" loan originators for those trusts, used "underwriting guidelines
> [that] are primarily intended to evaluate the prospective borrower's
> credit standing and ability to repay the loan, as well as the value and

---

[4] "Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters . . . . Section 12(a)(2) imposes liability under similar circumstances against certain 'statutory sellers' . . . . And § 15 imposes liability on individuals or entities that 'control[ ] any person liable' under §§ 11 or 12." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 2012 WL 3854431, at *7 (2d Cir. Sept. 6, 2012).

adequacy of the proposed mortgaged property as collateral." . . . In fact, plaintiffs allege, FNBN "routinely violated" its lending guidelines and instead approved as many loans as possible, even "scrub[bing]" loan applications of potentially disqualifying material. Indeed, plaintiffs allege that this was FNBN's "business model," aimed at milling applications at high speed to generate profits from the sale of such risky loans to others. Thus, plaintiffs say, contrary to the registration statement, borrowers did not "demonstrate[ ] an established ability to repay indebtedness in a timely fashion" and employment history was not "verified." . . .

The district court ruled that, read together with such warnings, the complained-of assurances were not materially false or misleading, but we cannot agree. Neither being "less stringent" than Fannie Mae nor saying that exceptions occur when borrowers demonstrate other "compensating factors" reveals what plaintiffs allege, namely, a wholesale abandonment of underwriting standards. . . . The same can be said about the warning that "[c]ertain [m]ortgage [l]oans were underwritten to nonconforming underwriting standards, which may result in losses or shortfalls to be incurred on the [o]ffered [c]ertificates." Using "nonconforming" standards is different than having no standards; and this statement makes it seem as though only some ("certain") loans were underwritten under these standards, leaving the impression that most other loans used "conforming" standards. . . . The harder problem is whether enough has been said in the complaint – beyond conclusory assertions – to link such practices with specific lending banks that supplied the mortgages that underpinned the trusts. Similar complaints in other cases have cited to more substantial sources, including statements from confidential witnesses, former employees and internal e-mails.

*Plumbers' Union Local No. 12 Pension Fund*, 632 F.3d at 772-773 & n.11.

Initially, the parties disagree over the pertinent standard to be applied.

Cribbing from the First Circuit's opinion, defendants argue that plaintiffs must

produce evidence of a "wholesale abandonment of underwriting standards" by FNBN.

Thus, if FNBN had any underwriting standards at all, even shoddy ones, plaintiffs (as

defendants see it) have no viable cause of action.  In contrast, plaintiffs contend that

all they must do is produce prima facie evidence supporting the critical contention

made in their Complaint, namely if whether contrary to Nomura's affirmative

representations, the Bank's loan underwriting guidelines were not primarily intended

to evaluate a prospective borrower's ability to repay the loan.

In the court's view, the standard (as it has previously held) is neither as

stringent nor as permissive as the polar positions staked out by the parties.  To

survive a Rule 12(b)(6) dismissal of the Section 11 claims, plaintiffs must plausibly

demonstrate that Nomura (or its affiliates) misrepresented (or omitted) material

information about FNBN's underwriting guidelines.  *See In re Evergreen Ultra Short*

*Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 91 (D. Mass. 2010) ("Under

Section 11, as long as the plaintiff can prove a material misstatement or omission,

liability for the issuer of the security is 'virtually absolute, even for innocent

misstatements.'") (citation omitted); *see also Blackmoss Invs. Inc. v. ACA Capital*

*Holdings, Inc.*, 2010 WL 148617, at *7 (S.D.N.Y. Jan. 14, 2010) ("Plaintiff's claims

under the Securities Act of 1933 are measured by Rule 8's notice pleading

requirements, rather than Rule 9(b)'s particularity ones.").[5]

Taking heed of the First Circuit's admonition to provide "more substantial sources, including statements from confidential witnesses, former employees and internal e-mails," plaintiffs have attempted to flesh out five categories of evidence. First, they identify three "representative" no-document loans that FNBN originated. In each of these "No Doc" loans, the borrower's income was either unknown or unverified, or inadequate to make payments on the underlying mortgage, or if not, the borrower's debt to income ratio (DTI) belied any realistic probability that the borrower could keep up with mortgage payments over the life of the loan. Second, plaintiffs submit the declaration of Susan Wright, who underwrote loans at FNBN in 2006 and 2007 and generally corroborates the Complaint's allegations about FNBN's

---

[5] *Cf. Bauer v. Prudential Fin., Inc.*, 2010 WL 2710443, at *3-4 (D.N.J. June 29, 2010) ("'[U]nlike [securities] claims brought under the anti-fraud provisions of the 1934 Act, claims under the 1933 Act that do not sound in fraud are not held to the heightened pleading requirements of Fed. R. Civ. P. 9(b).' But, where 'section 11 1933 Act claims . . . are grounded in allegations of fraud[, they] are subject to Fed. R. Civ. P. 9(b).' Thus, for § 11 claims, a Court must examine the complaint to determine if they are based on allegations of fraud. . . . All § 11 claims will have allegations that statements were false and misleading – this is a requirement of a § 11 prima facie case. The question is whether, overall, the allegations assert that such false statements were made fraudulently or intentionally.") (internal citations omitted). Plaintiffs make no allegation of fraud with respect to their § 11 claims. *See* Consolidated Am. Compl. ¶ 178 ("For purposes of this cause of action, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.").

underwriting practices.[6]   Third, plaintiffs offer several emails generated by FNBN

employees, including Mortgage Division President Pat Lamb; Vice President of Risk

Management Renea Aderhold; "SVP Ops/Communication Manager" Beth

Rothmuller; Senior Vice President Lisa Sleeper; and Senior Vice President and Risk

Officer Eric Meschen, which collectively paint a picture of a devil-may-care

underwriting culture.[7]   Fourth, plaintiffs submit the expert report of Ira Holt, an

accountant who performed a forensic analysis of 408 of the Trusts' loans using the

FNBN guidelines that were in place when they were originated.  Holt found that 108

(26.5%) had material defects that violated even FNBN's slack underwriting

standards.[8]   Finally, plaintiffs fault Nomura's due diligence with respect to the

---

[6] Wright describes FNBN's business model as trying to "make as many loans as possible and then sell them as quickly as possible" and explains that their underwriting practices instructed underwriters to remove income and asset information already in the possession of FNBN from "No Doc" loans.  She states that FNBN regularly made loans to borrowers whom "FNBN knowingly qualified on the basis of what appeared to be obviously false information [and] FNBN did not appear to reasonably expect that the borrowers would be able to repay these loans."  Pls.' Mot. Ex. 2.

[7] The FDIC, when it sued two former FNBN directors in August of 2011, alleged that FNBN "sealed its fate through lax underwriting."  Pls.' Mot. Ex. 28.

[8] According to Holt, he was unable to "re-underwrite" some of the 408 loans because of the lack of documentation, as well as the "scrubbing" of the applicant's disqualifying data by FNBN.  According to plaintiffs, the number of loans in the sample with material defects may be considerably higher than Holt's estimates.

purchase of the FNBN loans as being "fatally flawed."[9]

Nomura attacks this evidence as inconclusive at best, and, at worst, misleading. Nomura contends that: (1) the three "exemplary" loans singled out by plaintiffs were No Doc loans, and, by definition, did not require verification of a borrower's means to make payments[10]; and (2) the emails plaintiffs cite are taken "out of context."[11]

──────────────

[9] Nomura initially selected 30% of the loans to make up its sample pool, then divided that number in half – one half was meant to be the "adverse selection," which was intended to be representative of the riskiest *properties* but not necessarily the riskiest *borrowers*. After the due diligence results returned from the two outside vendors, Jeff Hartnagel, Nomura's "VP Transaction Management," sent an email expressing concern over the "quality" of the loans, stating that the initial results appeared to be "rejects from prior trades." Pls.' Mot. Ex. 36. On this basis, Nomura conducted due diligence on an additional 125 loans from the pool with the lowest diligence scores. The outside vendor, Clayton, assigned a failing grade to 21.58% of the loans it reviewed; yet Nomura purchased the entire pool.

[10] I must admit that I find this defense baffling as it simply confirms what plaintiffs are alleging.

[11] The context of the emails, however, puts FNBN's practices in no better light. An email from Pat Lamb (Ex. 3) reads in relevant part:

> [W]e are in the business of making loans that we can sell profitably. . . . For me, protecting the bank also means that we all do what we can to find ways to make good loans. Finding ways to make loans, and doing it quickly and with our customer service focus in mind is critical. In short, we need to make certain that we are reviewing every loan with an eye towards how do we make it work? Have we offered a counter if we cannot make the loan under the terms as submitted? Are we looking for documentation not required by the loan program and/or the Avenue approval? . . . I do not want to close every application that has been submitted to us and I am not asking you to approve loans you do not feel

Nomura also vehemently argues that the due diligence it commissioned exceeded industry standards.[12]   Finally, Nomura attacks the facts on which the Wright declaration and the Holt report are based.

As this brief recital suggests, defendants' efforts to impugn plaintiffs' evidence is largely factual in nature and better fitted to a summary judgment motion than the

---

> comfortable in approving and I do not expect your decisions to always be perfect.  I do want to close as many loans as you believe are credit and appraisal worthy and I do expect that there will be loans that we have to repurchase from time to time.

A second email on which plaintiffs rely (Ex. 4), from Lisa Sleeper, states, "[m]athematically, a lot of our borrowers would not or could not actually own a home much less pay rent, pay for food, etc."  Sleeper continued, "[w]e have also found that in [California] there are usually a few parties living within properties in order to be able to afford the housing there.  [California] is truly a beast within itself."  This email is responsive to a chain of at least five emails that question whether a painter living in the Bay Area could really be making $95,000 a year.  One underwriter explains to another that the cost of living in the Bay Area is extremely high, and this "painter" was actually a senior painter for a small company and had owned his own home previously.  To check the painter's income, one underwriter appears to suggest pulling the business license information from the California contractor's website. Sleeper sent another email several months later (Ex. 25), in which she complains about the lack of quality control and the mixed messages on the subject being sent by senior management.

[12] No clear explanation is given of what these standards (such as they may have been) were.  Plaintiffs argue that Nomura, in any event, cannot rely on its due diligence at this stage because its reliance is an affirmative defense.  *See NECA-IBEW Health & Welfare Fund*, 2012 WL 3854431, at *7 n.8.  Moreover, plaintiffs argue that regardless, under Section 11, strict liability applies to trust issuers even for innocent misstatements.  *Id.* at *7 ("Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters . . . .").

9

relaxed pleading standard that attaches to a Rule 12(b)(6) motion.  Consequently, the court will put these efforts aside as premature, and turn to defendants' alternative Rule 12(b) motion to dismiss.

**_Motion to Dismiss_**

"A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) is appropriate when the plaintiff lacks standing to bring the claim." _Edelkind v. Fairmont Funding, Ltd._, 539 F. Supp. 2d 449, 453 (D. Mass. 2008).

> When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first. . . . It is not simply formalistic to decide the jurisdictional issue when the case would be dismissed in any event for failure to state a claim.  Different consequences flow from dismissals under 12(b)(1) and 12(b)(6): for example, dismissal under the former, not being on the merits, is without res judicata effect.

_Katz v. Pershing, LLC_, 806 F. Supp. 2d 452, 456 (D. Mass. 2011), quoting _Ne. Erectors Ass'n of the BTEA v. Sec'y of Labor_, _Occupational Safety & Health Admin._, 62 F.3d 37, 39 (1st Cir. 1995).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief."  _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 559 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

10

recitation of the elements of a cause of action will not do." *Id*. at 555 (internal quotation marks and citations omitted); *see also Rodríguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95-96 (1st Cir. 2007).  A complaint will also be dismissed where the statute of limitations bars its claims.  *See* Fed. R. Civ. P. 12(b)(6).

In capsule form, defendants' argument is that plaintiff-Plumbers' Fund (one of the three remaining plaintiff pension funds) has no standing to bring this action because it suffered no loss causally connected to any of the alleged false misrepresentations.  Moreover, because Plumbers' Fund was the only one of the three extant plaintiffs to have filed a complaint within the applicable one-year statute of limitations, the Complaints of the remaining two plaintiffs (Pipefitters' Fund and NECA-IBEW), which are piggy-backed on the Plumbers' Fund Complaint, necessarily fail as well.  *See In re Elscint, Ltd. Sec. Litig.*, 674 F.Supp. 374, 378 (D. Mass. 1987) ("[I]t would be improper to allow the filing of a class action by nominal plaintiffs who are wholly inadequate to represent the asserted class to have the effect of tolling limitation to permit the otherwise untimely intervention of proper class representatives.").

Defendants' standing argument is two-fold.  First, defendants contend that Plumbers' Fund lacks standing to sue on the 2006-AP1 offering because it did not

purchase any Certificate in that offering. This is undisputed.[13] *See Plumbers' Union Local No. 12 Pension Fund*, 632 F.3d at 770-771 (a named plaintiff may not represent the interests of investors in a mortgage-backed security where the named plaintiff did not participate in the offering). Second, Nomura contends that with respect to the 2006-AF1 offering, Plumbers' Fund sold its Certificate prior to the first "corrective disclosure"[14] issued by Nomura concerning the 2006-AF1 Certificate and therefore can show no causal relationship between any loss and the purported misrepresentation(s).

Plaintiffs, for their part, insist that defendants have mistakenly labeled their argument as one of standing. Defendants cannot contest Plumbers' standing, they argue, by challenging Plumbers' failure to allege loss causation when loss causation is *not* a part of the prima facie case in either a Section 11 or Section 12 Securities Act lawsuit. *See In re Evergreen*, 705 F. Supp. 2d at 94 ("Loss causation is not, however, an element of a prima facie case under Sections 11 and 12 and, accordingly, the plaintiffs are under no obligation to plead it.").

---

[13] As it bears on the later analysis, it is important to note that Pipefitters' Fund and NECA-IBEW did purchase shares of the 2006-AP1 offering.

[14] A corrective disclosure is a statement revealing the falsity of an issuer's prior representations regarding a security. *See Catogas v. Cyberonics, Inc.*, 292 Fed. App'x. 311, 314 (5th Cir. 2008).

12

Neither scienter, reliance, nor loss causation is an element of § 11 or
§ 12(a)(2) claims . . . . Nor do the heightened pleading standards of the
Private Securities Litigation Reform Act apply to such non-fraud claims.
*See* 15 U.S.C. § 78u-4(b)(1)-(2). Thus, the provisions "place [ ] a
relatively minimal burden on a plaintiff." . . . [*See also*] *In re Morgan
Stanley Info. Fund* [*Sec. Litig.*], 592 F.3d [347,] 359, 360 [(2d Cir.
2010)] (observing that §§ 11 and 12(a)(2) "apply more narrowly but
give rise to liability more readily" than § 10(b) of the Securities
Exchange Act of 1934, 15 U.S.C. § 77j (b)).

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 2012 WL 3854431,

at *7 (2d Cir. Sept. 6, 2012).

Instead, the absence of loss causation (sometimes termed "negative loss

causation") is an affirmative defense.  *See McMahan & Co. v. Wherehouse Entm't,

Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995) ("[W]here a defendant proves that the decline

in the value of the security in question was not caused by the material omissions or

misstatements in the registration statement, plaintiff is not entitled to recover any

damages."); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272

F. Supp. 2d 243, 253 (S.D.N.Y. 2003) ("It is an affirmative defense under Sections

11 and 12 that if the amounts recoverable represent other than the depreciation in

value of the subject security resulting from such part of the prospectus, oral

communication, or registration statement, with respect to which the liability of the

defendant is asserted then such amount shall not be recoverable.").

Nonetheless, "occasionally courts have dismissed claims under Sections 11 and

13

12 on the pleadings when it was 'apparent on the face of the complaint' that the plaintiffs would be unable to establish loss causation." *In re Evergreen*, 705 F. Supp. 2d at 94, citing *In re Merrill Lynch*, 272 F. Supp. 2d at 253-254.   According to defendants this is one of those cases where the grounds for dismissal are apparent. Defendants argue that at the time Plumbers' Fund sold the 2006-AF1 trust (November 1, 2007), no corrective disclosure concerning *that* particular Certificate had been issued by Nomura.   Only afterwards, on November 13, 2007, did the announcement of the Moody's downgrade take place. *See* Consolidated Am. Compl. ¶ 173.   Because the sale and alleged loss[15] occurred before the corrective disclosure, it follows that the alleged misrepresentations could not have caused the loss. *See In re Merrill Lynch*, 272 F. Supp. 2d at 254-255, citing *Akerman v. Orykx Commc'ns, Inc.*, 810 F.2d 336,

---

[15] Defendants also suggest that the rather small $2,000 loss might more aptly be explained as a diminution in the principal value of the Certificate, which amortizes over time.   Indeed, argue defendants, Plumbers' Fund may have turned a profit from the investment.   Defendants also hypothesize that the loss could be explained by market movements caused by "a host of external market and economic factors." Hypotheticals, however, do not make out an affirmative defense. *See NECA-IBEW Health & Welfare Fund*, 2012 WL 3854431, at *15 n.15 ("It may well be that, ultimately, the Fund will recover nothing because defendants will prove that any diminution in value is attributable to, e.g., (1) illiquidity, (2) the global financial crisis, or (3) a widening of credit spreads rather than defendants' misrepresentations. But that is irrelevant to whether plaintiff has alleged, at the pleading stage, a cognizable injury under the statute.").

342 (2d Cir. 1987) (holding that where a price decline in stock occurred *prior* to the alleged public disclosure disclosing the misstatement, the decline in price "did not constitute a loss actionable under the 1933 Act because it could not have been caused by misstatements which had not yet been revealed").

Plaintiffs respond that *Akerman* does not operate as a bar to their claims. In a similar case, the Southern District of New York granted a motion to reconsider its initial decision to limit any recovery of losses to the period after a corrective disclosure was made. *In re WRT Energy Sec. Litig.*, 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005). Relying on *Akerman*, the original Order had held that "a decline in the value of securities prior to disclosure of the material misstatement or omission is not chargeable to the defendants." *Id.* at *1. In vacating this holding, the court explained that

> [t]o establish a prima facie Section 11 claim, the plaintiff need only plead a material misstatement or omission in a registration statement. . . . "[A]ny decline in value is presumed to be caused by the misrepresentation in the registration statement." Defendants have the burden of demonstrating the incorrectness of the presumption, and Section 11(e) relegates the "risk of uncertainty to the defendants."

*Id.* (citations omitted). The court concluded that

> *Akerman* does not relieve Defendants of their burden of establishing the affirmative defense of negative causation. In fact, the Circuit stated that even if a defendant meets this burden, the plaintiff may survive a summary judgment motion by coming forward with evidence suggesting

15

that the price decline resulted from the alleged misstatement.

*Id.* at *2, citing *Akerman*, 810 F.2d at 343.

Moreover, plaintiffs argue that the Complaint does allege other corrective disclosures that came well before the November 1, 2007 sale.[16]   Although these pre-sale disclosures do not *specifically* mention the 2006-AF1 Certificate, they involve the same issuer and underwriter.   Plaintiffs allege that the substance of the misstatements and omissions are the same for all Certificates, and relate directly to

---

[16] In the Consolidated Amended Complaint, plaintiffs make the following statements about disclosures:

On July 17, 2007, Moody's announced a possible downgrade of Normura Asset Alternative Loan Trusts, Series 2006-AF2, 2006-AR1 and 2006-AR2.  On October 15, 2007, Nomura Holdings disclosed that it would be shutting down its U.S. mortgage loan business. . . . Nomura Holdings acknowledged that the problem arising from its mortgage loan business stemmed from weak borrowers who were issued mortgage loans they could not afford.  On October 15, 2007, Nomura Holdings president Nobuyuki Koga told a news conference, "I think an unpredictable change in market conditions was not the only factor behind the losses.  We had constraints on our operations because of a weak client base.  We needed to overhaul our US operations to beef up competitiveness . . . ." . . . On October 25, 2007, Nomura Holdings posted a ¥10.5 billion ($92 million) loss for the July-September quarter, due to the sub-prime mortgage crisis in the United States. . . . On November 13, 2007, Moody's downgraded numerous classes of Certificates of Nomura Asset Alternative Loan Trusts, including Series 2006-AP1[ and] 2006-AF1.

*Id.* ¶¶ 169-173.

disclosures about Nomura's failing mortgage loan business, "stemm[ing] from weak borrowers who were issued mortgage loans they could not afford." Consolidated Am. Compl. ¶ 171.  As alleged in the Complaint, Plumbers' Fund knew that its Certificate was a mortgage-backed security, whose value depended on the strength of the loans issued to mortgagors.  Thus, at least at the pleading stage, it is not apparent that plaintiffs are wholly unable to plead loss causation.[17]

---

[17] Defendants also suggest that even if plaintiffs could establish that a public disclosure regarding the 2006-AF1 Certificate was made prior to the sale on November 1, 2007, the purported loss is less than 2%, which is "immaterial as a matter of law." Defs.' Reply Mem. at 8 n.6.  As support for this argument, defendants cite to *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161 (D. Mass. 2000). That case is inapposite.  *Segue Software* involved an alleged § 10-(b) violation.  This court found plaintiffs' claim deficient where they could not demonstrate "that any overstatement of earnings [by 2.6%] (coupled with other wrongs) was significant to their decision to purchase Segue stock (or to its valuation by the market)."  *Id*. at 170 (minor adjustments to a company's gross revenues are not generally deemed material or indicative of scienter).  Defendants would extend this general rule from a materiality/reliance calculation to a loss calculation.  In other words, defendants claim that because the alleged loss was only $2,000, it cannot have been as a matter of law materially "caused" by defendants' misrepresentations or omissions.  As plaintiffs point out, Section 11 does not include a floor for defining loss.  *See In re Constar Int'l. Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009) ("Section 11 does not require a showing of individualized loss causation, because injury and loss are presumed under § 11.  It bears repeating that, in a § 11 case, plaintiffs do not bear the burden of proving causation, damages are calculated as the difference between the purchase price of a security and the price at the time suit was filed or the security was sold, and any decline in value is presumed to be caused by the misrepresentation."); *see also NECA-IBEW Health & Welfare Fund*, 2012 WL 3854431, at *15-16 ("Thus, under § 11, the key is not, as the district court concluded and as defendants contend, market price; the key is value. . . . [Nor] must [a fixed income investor] miss an interest payment before his securities can be said to have declined in 'value.' . . . [W]hether

Finally, there is the issue of the claims brought by Pipefitters' Fund and NECA-IBEW.  Under Sections 11 and 12(a)(2), a plaintiff must bring a claim "within one year after the discovery of the untrue statement" upon which the claim is premised. 15 U.S.C. § 77m.  Defendants contend that Pipefitters and NECA-IBEW were on inquiry notice of the claims they seek to assert at least as of November 13, 2007, when the first corrective disclosure about the 2006-AF1 and 2006-AP1 offerings occurred.[18]  Pipefitters and NECA-IBEW did not bring their claims until November

---

Certificate-holders actually missed a scheduled coupon payment is not determinative. . . . NECA was not required to prove the precise amount of any damages at the pleading stage.").  Moreover, plaintiffs assert that although Plumbers' Fund incurred only a nominal $2,000 loss, Pipefitters' Fund and NECA-IBEW suffered larger losses.  *See* Pls.' Surreply at 5-6.

[18]  Determining the accuracy of defendants' contention requires a factual investigation into whether Pipefitters and NECA-IBEW, exercising reasonable diligence, should have "discover[ed] [] the untrue statement" within the year and eleven days that elapsed between the date of the corrective disclosure and the date of the filing of the Complaint.  *See* 15 U.S.C. § 77m; *cf. Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010) (holding that "facts showing scienter are among those that 'constitut[e] the violation'" and must be "discovered" for a claim to accrue); *Young v. Lepone*, 305 F.3d 1, 12 (1st Cir. 2002) (jury question as to whether plaintiff exercised reasonable diligence with respect to discovering the complained-of Rule 10b-5 violation).  Plaintiffs' argument that they deserve to be accorded a mere eleven additional "amnesty" days in which to investigate their claims is not terribly persuasive.  A tolling period is not a party favor that is bestowed on a plaintiff as a matter of right  simply because the request does not seem unreasonably excessive in the number of days sought.  Plaintiffs offer no convincing reason why what was "discovered" in 376 days called not have been uncovered in 365.  Nonetheless, because the court finds that Pipefitters' and NECA-IBEW's 2006-AP1 claims were in any event tolled by the timely filing of the original putative class complaint, the

24, 2008, when they filed a motion jointly with Plumbers' Fund for appointment as lead plaintiffs. Plaintiffs' claims are thus time-barred unless the statute of limitations was tolled pursuant to the doctrine announced in *American Pipe Construction Co. v. Utah*, 414 U.S. 538 (1974).

In *American Pipe*, proposed class members sought to intervene in an antitrust class action after a district court denied class certification for lack of numerosity. The district court concluded that the statute of limitations had expired and denied the motions to intervene as untimely. The Supreme Court reversed, holding that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *Id.* at 553. The Court reasoned that a contrary rule requiring potential class members to "successful[ly] anticipat[e] . . . the determination of the viability of the class" would "induce[] [them] to file protective motions to intervene or to join in the event that a class was later found unsuitable," and thereby "deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." *Id.* at 553-554. The Court further stated that "[t]his rule is in no way inconsistent with the functional operation of a statute of limitations," as it permits tolling only of claims of which the

_____

court need not pursue this inquiry further.

19

defendant was timely put on notice by virtue of the putative class complaint. *Id.* at 554-555.

Defendants concede that the *American Pipe* rule tolls the statute of limitations on claims that Plumbers' Fund had standing to bring, which, as the court concluded above, includes claims pertaining to the 2006-AF1 Certificate. *See supra*. But whether the rule applies to claims for which the Plumbers' Fund lacked standing – namely, the 2006-AP1 Certificate, which Plumbers' Fund did not buy – is a subject of much debate. Neither the Supreme Court[19] nor the First Circuit has addressed this issue, and the courts that have done so are divided. As one court summarized the divide, "[courts] that have applied the *American Pipe* tolling rule in these or similar circumstances have stressed the policies animating that decision. Those declining to do so have emphasized the tolling rule's potential for abuse." *In re Indymac Mortg.- Backed Sec. Litig.*, 793 F. Supp. 2d 637, 646 (S.D.N.Y. 2011) (footnotes omitted)

---

[19] Seizing upon the Supreme Court's statement in *American Pipe* that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class *who would have been parties* had the suit been permitted to continue as a class action," 414 U.S. at 553 (emphasis added), defendants argue that "[i]f the named plaintiff lacked standing to represent a particular plaintiff, then that plaintiff would not have been a party to the class action and *American Pipe* does not toll that plaintiff's claims." Defs' Mem. at 12. This argument overlooks the fact that the Court expressly noted "that it was not considering a situation in which class certification was denied 'for lack of standing of the representative.'" *Hill v. State St. Corp.*, 2011 WL 3420439, at *26 (D. Mass. Aug. 3, 2011) (quoting *Am. Pipe*, 414 U.S. at 553).

(collecting cases); *see also In re Direxion Shares EFT Trust*, 279 F.R.D. 221, 237 n.9

(acknowledging split); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,

810 F. Supp. 2d 650, 668-669 (S.D.N.Y. 2011) (same).  Where and how to strike the

balance between these polar positions is a matter of policy that the First Circuit and,

ultimately, the Supreme Court, must decide.  In the absence of guidance, however,

this court has the responsibility to make a decision according to its best judgment.

In so doing, I conclude that under the circumstances of this case the reasoning of the

*In re Indymac Mortgage-Backed Securities Litigation* line of cases the more

persuasive.

Applying the tolling rule to Pipefitters' and NECA-IBEW's 2006-AF1

Certificate claims advances the policies of efficiency and economy served by Rule 23

and *American Pipe*.  As indicated above, the *American Pipe* tolling rule is intended

to give a disincentive to putative class members from filing duplicative, protective

filings.  Under the outcome advocated by defendants, proposed class members would

be forced to do just that in order to preserve their claims in the event that the class

representative(s) was later found to lack standing, because of an internal technical

failure (in this case the failure to purchase a particular certificate in a raft of related

securities offerings) that would not be as apparent to a putative class member as

would be the subject matter of the suit itself.  The court is loath to "punish class

21

members for relying on the very thing Rule 23 is intended to provide:  an efficient method for resolving claims common to a class of individuals without the need for wasteful and duplicative litigation." *In re Initial Pub. Offering Sec. Litig.*, 2004 WL 3015304, at *5 (S.D.N.Y. Dec. 27, 2004).

Application of the tolling rule in this case further comports with "the polic[y] of ensuring essential fairness to defendants." *Am. Pipe*, 414 U.S. at 554 (internal quotation marks omitted).  The original complaint filed by Plumbers' Fund included the claims pertaining to the 2006-AP1 Certificate.   "[D]efendants," therefore, "are not being blindsided or forced to defend against stale claims." *In re Morgan Stanley*, 810 F. Supp. 2d at 669.  To the contrary, "the complaint unquestionably apprised them '[w]ithin the period set by the statute of limitations . . . [of] the essential information necessary to determine both the subject matter and the size of the prospective litigation.'" *Id.,* quoting *Am. Pipe*, 414 U.S. at 555; *see also Rose v. Arkansas Valley Envtl. & Util. Auth.*, 562 F. Supp 1180, 1193 (W.D. Mo. 1983) (reasoning that a putative class action that is denied for lack of standing of the representative may be more likely to give defendants actual notice of the claims of individual class members than one denied for lack of typicality or commonality).

The court is sensitive to the concern that any reflexive application of the *American Pipe* tolling rule in cases where the class representative is found to lack

standing could create a significant potential for abuse.  *See, e.g.*, *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1167 (C.D. Cal. 2010) ("This Court shares the concern of other district courts that extending *American Pipe* tolling to class action claims the original named plaintiffs had no standing to bring will encourage filings made merely to extend the period in which to find a class representative.").  There may be circumstances, for example, in which the purported class representative so clearly lacks standing that allowing intervention after certification is denied would condone (and even invite) the filing of placeholder lawsuits.  *See In re Morgan Stanley*, 810 F. Supp. 2d at 670.  The court is not convinced, however, that a vigilant district court would be any less able (or inclined) to ferret out and sanction instances of placeholder abuse than other abuses of the litigation process. *See McCarty v. Verizon New England, Inc.*, 674 F.3d 119 (1st Cir. 2012).

While the First Circuit ultimately affirmed this court's conclusion that Plumbers' Fund lacked standing to pursue the 2006-AP1 Certificate claims, the issue, as the Court emphasized, was neither "straightforward" nor "well settled." *Plumbers' Union Local No. 12 Pension Fund*, 632 F.3d at 768.  Indeed, in its opinion the First Circuit canvassed authority suggesting that "the class action should embrace defendants against whom no named plaintiff has a claim so long as the claims are

23

essentially of the same character as the claim against a properly named defendant." *Id.* at 769-770 (collecting cases). Given this authority and the overlap in the conduct underlying the 2006-AP1 and 2006-AF1 claims, the putative class members were not unreasonable in believing prior to the rulings of this court and the First Circuit that Plumbers' Fund standing extended to certificates beyond the 2006-AF1 Certificate that it had purchased.[20] The reasonableness of this reliance, when coupled with the absence of any evidence that plaintiffs were attempting to engage in placeholder abuse, assuages any concerns and militates in favor of tolling. *Compare In re Morgan Stanley*, 810 F. Supp. 2d at 670 (permitting tolling under similar circumstances), *with Direxion*, 279 F.R.D. at 238 (refusing to toll where proposed intervenor could not reasonably have believed that asserted class would protect his interests), *and Fleming v. Bank of Boston Corp.*, 127 F.R.D. 30, 34, 36 (D. Mass. 1989) (refusing to toll where investors could not reasonably have relied on receiver, who had requested and been denied authority to represent investors, to litigate their

---

[20] Inasmuch as Plumbers' Fund clearly had standing to assert the 2006-AF1 claims, the court finds inapposite the various cases relied upon by defendants in which courts refused to apply the *American Pipe* tolling rule where the original named plaintiffs did not have standing to litigate *any* of the claims brought on behalf of the purported class. *See Hill v. State St. Corp.*, 2011 WL 3420439, at *26 n.19 (D. Mass. Aug. 3, 2011) (applying *American Pipe* and distinguishing *In re Elscint*, 674 F. Supp. at 378-379, on grounds that the original plaintiffs in *Elscint* lacked standing as to any claims and thus were "wholly inadequate" to represent the purported class).

claims).

In sum, the court finds that pursuant to the tolling rule of *American Pipe*, Pipefitters' and NECA-IBEW's claims were timely.

ORDER

For the foregoing reasons, plaintiffs' motion to proceed with the litigation is ALLOWED. Defendants' renewed motion to dismiss is DENIED. Defendants' motions to exclude the expert report of Ira Holt and to strike the declaration of Susan Wright are DENIED without prejudice. The parties will jointly submit a proposed revised discovery schedule within ten (10) days of this Order. Defendants also will notify the court within ten (10) days if they intend to make an application for leave to file an interlocutory appeal.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE